A09A1967. HAM v. THE STATE.
A09A1968. LESTER v. THE STATE.
(692 SE2d 828)

PHIPPS, Judge.

Paul Ham III and Corey Lester were each convicted of armed robbery (two counts), kidnapping, burglary, aggravated assault and possession of a firearm during the commission of a felony (three counts). In Case No. A09A1967, Ham claims that the evidence was insufficient to support his convictions, that the trial court abused its discretion in refusing to remove certain jurors for cause, that the trial court erred in denying his motion to sever his trial from that of his co-defendant, and that the trial court erred in sentencing him. In

Case No. A09A1968, Lester claims that the evidence was insufficient to support his convictions, that he received ineffective assistance from his trial counsel, and that the trial court erred in denying his motion to sever.

In both cases, we find that the evidence was insufficient to support the kidnapping conviction, but was sufficient to support the other convictions. Addressing Case No. A09A1967, we conclude that the trial court erred in failing to excuse a prospective juror for cause, and that Ham's convictions must therefore be reversed. Because the evidence was sufficient to support his convictions for armed robbery, aggravated assault, burglary and possession of a firearm during the commission of a felony, Ham can be retried on those charges.[1] Addressing Case No. A09A1968, we conclude that the trial court did not err in denying Lester's motion to sever, and we find no merit in Lester's claim of ineffective assistance of trial counsel. Accordingly, we reverse Lester's kidnapping conviction and affirm the remaining convictions.

The evidence at trial showed that on the evening of July 13, 2007, Shannon Moore and his girlfriend Cheree Mollison were at their apartment with their children and two of Mollison's friends. Mollison and her friends were in a bedroom watching a movie, some of the children were in another bedroom, and Moore was in the living room with the youngest child, who was sleeping in a playpen.

Moore heard a knock at the door, and opened it to three men. One of the men pointed a gun at him. Two men came into the living room immediately, one of whom approached Moore with a gun and instructed him to get on the floor. Moore complied. Mollison heard a loud noise and went into the living room. When she saw Moore on the floor with a gun to his head, she screamed. She also saw one man by the door and another man with a gun. That man approached her and told her to be quiet, stop looking at him, move to a corner of the room and face the wall. Mollison complied.

The man holding Moore to the ground demanded to be shown "where it was." Moore was not certain what he meant so he directed the men to a safe where he kept money. With a gun to the back of his head, the men grabbed Moore and took him from the living room to the bedroom where the safe was located. Moore gave the men the combination to the safe, where he had $400 in cash, coins in an undetermined amount and a microphone worth $350. One man held him while the other opened the safe. Moore testified that the man who went to the safe was dark-skinned, wore a black and red shirt and a black and red ball cap, and had his hair in dreadlocks. Moore

---

[1] See *Lively v. State*, 262 Ga. 510, 512 (3) (421 SE2d 528) (1992).

saw that man take the items from the safe. He described the other man with a gun as brown-skinned and wearing a white t-shirt.

After Mollison screamed, one of her friends hid under the bed. When the men came into the bedroom looking for the safe, a man wearing a white shirt pushed Mollison's other friend down on the bed. That friend heard one man yelling, "where is it," and saw him pushing Moore toward the closet while holding a gun. She described that man as wearing a red shirt and a bandana across a portion of his face, with his hair in dreadlocks.

After the items were taken from the safe, the men ran out the apartment door. Moore grabbed his gun from the bedroom and followed. He saw the man with the white shirt jump down the stairs and run across the parking lot toward a van. Moore shot at him, the man shot back, and Moore took cover.

Mollison followed Moore outside and saw a black van backed into a corner of the parking lot. She saw two men running down the steps toward the van, one man coming out of the van and another man, who was wearing a white t-shirt and had been shot, being helped into the van. Mollison testified that the men running across the parking lot were the same men who had been in her apartment. When Mollison tried to stop Moore from shooting, he pulled her into the apartment and she lost consciousness. Her friend came out from under the bed, saw Mollison on the floor, thought she may have been shot and called 911. No other shootings were reported in the county that night.

Mollison described one of the men as wearing a black shirt with a black bandana halfway across his face, under his nose. She described another man as being slender, dark-skinned and wearing a white t-shirt. According to Mollison, the third man was big, wore a red shirt and had "wild hair," by which she meant he was growing dreadlocks. On cross-examination, Mollison testified that the "two gentlemen sitting on the defendant's side were those that entered my home."

Before the shooting began, occupants of a downstairs apartment saw men wearing bandanas walk around the apartment building twice. One man then went upstairs and put his ear to the door of Moore and Mollison's apartment, waited for a minute, and then went back down the stairs. When the gunshots began, that man ran. One of the neighbors saw a gold van and a man running toward the van who was limping. Other men in the van pulled the limping man into the van and left.

After the shooting and before the police arrived, Moore panicked, hid his gun outside the apartment and left. He later returned and spoke to a detective about what had happened, showing him where he had hidden the gun.

A county detective responded to the call that shots had been fired at the apartment complex. He saw three shell casings from .380 caliber bullets, CVC brand, in the parking lot and four shell casings from .380 caliber bullets, Winchester brand, on the balcony area of the apartment where Moore and Mollison lived. In the adjacent parking lot, he found a gun he described as a "Colt pocket light" .380. A car in the parking lot belonging to one of Mollison's friends had been shot several times.

A second county detective went to Kennestone Hospital, which was about three miles from the apartment complex. He was informed that two gunshot victims, whom he identified at trial as Ham and Lester, had come into the emergency room.

The detective observed a gunshot wound to the back of Lester's leg. Lester told him that he had been a passenger in a silver minivan that had been driven to an apartment complex near Pat Mell Road, which was a major road near the apartment complex where the shooting occurred. Lester said that he went there to meet some women, and that when he exited the van, he was approached by five men running at him and shooting. He was shot as soon as he exited the van. In a statement given later that same night, Lester said that he had gone upstairs to an apartment in the complex, but had not gone inside. He stood outside and smoked a cigarette. As he was walking downstairs, he heard shots and hid behind a car. He was shot at this point. He fled to a gray minivan and got a ride to the hospital. The detective collected Lester's clothing from the hospital, which included a red t-shirt, black tank top, black glove and dark-colored bandana.

The second detective observed that Ham had a deep graze on his arm, and Ham told him that he had been shot in the back of his leg. Ham said that he went to the apartment complex in a blue minivan and that he stepped out of the van and waited for some period of time until some people came toward the van shooting, and he was shot. Ham did not know why he was at the apartment complex. The detective spoke to Ham again that same night, and he said that he had been at his grandmother's house prior to going to the apartment complex. The detective collected from Ham a white t-shirt, white tennis shoes, keys, a lighter and $10.50.

### Case No. A09A1967

1. Ham claims that the evidence was insufficient to support his convictions.

On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict and an

appellant no longer enjoys the presumption of innocence. [We] determine[ ] whether the evidence is sufficient under the standard of *Jackson v. Virginia,* 443 U. S. 307, 99 SC 2781, 61 LE2d 560 (1979), and do[ ] not weigh the evidence or determine witness credibility. Any conflicts or inconsistencies in the evidence are for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the [s]tate's case, we must uphold the jury's verdict.[2]

(a) Ham was convicted of kidnapping Moore. He claims that the evidence was insufficient to show the asportation element of the kidnapping charge under the standard set forth in *Garza v. State.*[3]

"A person commits the offense of kidnapping when such person abducts or steals away another person without lawful authority or warrant and holds such other person against his or her will."[4] To prove abduction or stealing away, the state must prove the element of asportation,[5] which the Supreme Court of Georgia re-defined in *Garza.* Under the new definition, a finding of asportation requires an assessment of the following four factors:

(1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement was an inherent part of that separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense.[6]

The Supreme Court explained that

[a]ssessment of these factors will assist Georgia prosecutors and courts alike in determining whether the movement in question is in the nature of the evil the kidnapping statute was originally intended to address — i.e., movement serving to substantially isolate the victim from protection or rescue — or merely a "criminologically insignificant circumstance" attendant to some other crime.[7]

---

[2] *Rankin v. State*, 278 Ga. 704 (606 SE2d 269) (2004) (citations omitted).

[3] 284 Ga. 696 (670 SE2d 73) (2008).

[4] OCGA § 16-5-40 (a).

[5] *Garza*, supra at 697 (1).

[6] Id. at 702 (1) (citation and footnote omitted).

[7] Id. (citation omitted). The legislature subsequently amended the kidnapping statute, OCGA § 16-5-40, effective July 1, 2009, but because that is a substantive change to the law, it

Here, the movement of Moore from the living room to the bedroom was of minimal duration, and it occurred as part of the armed robbery and in furtherance of that offense. The movement itself did not present a significant danger to Moore independent of the danger he already faced. Thus, analyzed under the factors set forth in *Garza*, the asportation element was not established, and Ham's kidnapping conviction must be reversed.[8]

(b) Ham was convicted of the armed robbery of both Moore and Mollison. He contends that the state failed to prove that the property taken from the safe belonged to Moore *and* Mollison, as alleged in Counts 1 and 2 of the indictment.

A person commits the offense of armed robbery when, with intent to commit theft, he takes property of another from the person or the immediate presence of another by use of an offensive weapon.[9]

> The general rule that allegations and proof must correspond is based upon the requirements (1) that the accused is definitely informed of the charges against him so he can present his defense and not be surprised by the evidence at trial, and (2) that he is protected against another prosecution for the same offense.[10]

Here, the indictment sufficiently alleged the elements of armed robbery, and "[t]here can be no reasonable doubt that [Ham] was sufficiently informed of the charges against him and also protected from subsequent prosecution for the same crime."[11] Further, "the gravamen of the offense of armed robbery is the taking of items from the possession of another by use of an offensive weapon, and not the [identification of the specific owner] of the item taken."[12] The evidence sufficiently showed that both Moore and Mollison were subjected to the robbers' exercise of actual force by the use of an offensive weapon so as to induce the relinquishment of the property of another.[13]

Ham further contends that the state failed to prove that property was taken from the person and immediate presence of Mollison,

---

has no retroactive effect here.

[8] See *Garza*, supra, at 704 (3).

[9] OCGA § 16-8-41 (a).

[10] *Johnson v. State*, 293 Ga. App. 32, 34 (1) (666 SE2d 452) (2008) (citation omitted).

[11] Id. at 35 (citation and punctuation omitted).

[12] Id. (citation and punctuation omitted).

[13] See id.; see also *Kelly v. State*, 234 Ga. App. 893, 894 (2) (508 SE2d 228) (1998) (property taken in armed robbery need not belong to victims where both were subject to robber's exercise of actual force by the use of an offensive weapon so as to induce the relinquishment of the property of another).

as alleged in Count 2 of the indictment. Although Ham is correct that a conviction for armed robbery requires proof that the robber took "property of another from the person or the immediate presence of another,"[14] the term "immediate presence" has been extended to uphold robbery convictions even when the theft occurs outside the physical presence of the victim.[15] "Considering that [Mollison] was held at gunpoint in [her] living room while property was taken from [her] bedroom, the theft was not too far afield to be outside [Mollison's] immediate presence."[16]

(c) Ham contends that the evidence was insufficient because he was not identified as a participant in the crimes, arguing that no evidence connected him to these crimes other than getting shot with Lester. "Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."[17] Ham argues that he was merely present at the scene. "Although mere presence at the scene of a crime is not sufficient to convict one of being a party to a crime, criminal intent may be inferred from conduct before, during, and after the commission of the crime."[18]

Based upon our careful review of the record, we conclude that there was sufficient evidence to enable a rational trier of fact to find Ham guilty beyond a reasonable doubt of being at least a party to the crimes of armed robbery, burglary, aggravated assault and possession of a firearm during the commission of a felony.[19]

2. Ham claims that the trial court abused its discretion in refusing to remove four prospective jurors for cause.

(a) During individual questioning, Juror No. 21 expressed his belief that defendants had too many rights, stated that he would be upset if defense counsel attacked the credibility of prosecution witnesses if their accounts were consistent, and stated that he honestly believed that a person charged with a crime must be guilty

---

[14] OCGA § 16-8-41 (a).

[15] *Meyers v. State*, 249 Ga. App. 248, 249 (547 SE2d 781) (2001).

[16] Id. (citations omitted).

[17] OCGA § 16-2-20 (a). A person is concerned in the commission of a crime only if he: (1) Directly commits the crime; (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity; (3) Intentionally aids or abets in the commission of the crime; or (4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime. OCGA § 16-2-20 (b).

[18] *Scott v. State*, 297 Ga. App. 577, 580 (677 SE2d 755) (2009) (citation and punctuation omitted).

[19] See generally *Rankin*, supra; see *Scott*, supra (armed robbery); *Mitchell v. State*, 271 Ga. App. 711, 713 (1) (610 SE2d 672) (2005) (burglary); *London v. State*, 247 Ga. App. 618, 622-623 (5) (544 SE2d 525) (2001) (aggravated assault); *Howze v. State*, 201 Ga. App. 96, 97 (410 SE2d 323) (1991) (possession of a firearm during commission of a felony).

of something. When asked if he would retain that belief if the judge told him that all defendants are presumed innocent, he responded, "At this point I don't think I'm presuming that — I don't think I have a presumption of innocence." When the trial court allowed counsel to further question Juror No. 21 the following day, he stated that he did not know what reasonable doubt meant, and the trial court declined to define it for him. He did state that he would listen to the trial court's definition of that term at trial. Juror No. 21 expressed his belief that the grand jury's indictment indicated that there was enough evidence to go to trial and that he had already formed an opinion that because the defendants were indicted something must have happened. When asked if he could find the defendants not guilty if the state could not prove they were criminals, he responded that he could do so because "those guys aren't criminals yet." Nonetheless, when presented with a football analogy where the state must prove guilt beyond a reasonable doubt to get into the end zone, he acknowledged he had already formed an opinion that because of the grand jury indictment, the prosecution was starting at about mid-field instead of the one-yard line.

In denying Ham's motion to excuse Juror No. 21 for cause, the trial court concluded that the prospective juror was conservative and had some opinions, but stated, "I haven't heard that he's leaning one way or the other." The defendants subsequently used a peremptory strike to remove prospective Juror No. 21 from the panel.

> Only upon a finding of manifest abuse of discretion may a trial judge's decision concerning juror qualification be reversed. But even given this latitude, the potential impact of juror bias must not be underestimated. Running through the entire fabric of our Georgia decisions is a thread which plainly indicates that the broad general principle intended to be applied in every case is that each juror shall be so free from either prejudice or bias as to guarantee the inviolability of an impartial trial.[20]

In this situation, Juror No. 21 was clearly biased against the defendants and gave no indication that he intended to be impartial during the trial. Here, the trial court never questioned Juror No. 21 and the questioning by counsel for the parties "failed to elicit the necessary response that [he] would be able to lay aside [his] prejudices and personal experiences and fairly and impartially decide

---

[20] *Park v. State*, 260 Ga. App. 879, 880-881 (1) (581 SE2d 393) (2003) (citations and punctuation omitted).

the case on the evidence presented at trial."[21] Accordingly, we conclude that the trial court abused its discretion in failing to remove Juror No. 21 for cause.[22] For this reason, Ham's convictions must be reversed.[23]

(b) Having reversed Ham's convictions based on the trial court's failure to strike Juror No. 21 for cause, we need not resolve whether the trial court also erred in failing to strike Juror Nos. 9, 26 and 47 for cause.[24]

3. Given our reversal of Ham's convictions and our resolution of Lester's appeal, we need not address Ham's contentions regarding his motion to sever or sentencing.

## Case No. A09A1968

4. Lester contends that the evidence was insufficient to support his convictions.

(a) Lester was convicted of kidnapping Moore. Under the analysis set forth in Division 1 (a), that conviction must be reversed.

(b) With respect to his convictions for armed robbery, aggravated assault and burglary, Lester contends that he was not identified "with certainty" as one of the individuals who entered the apartment. As to his convictions for possession of a firearm during the commission of a felony, Lester contends that the firearm found in the parking lot was not traced to him.

Based on the testimony of the persons inside the apartment, the circumstantial evidence and the physical evidence introduced at trial, we conclude that a rational trier of fact could have found Lester guilty beyond a reasonable doubt of being at least a party to the crimes of armed robbery, burglary, aggravated assault and possession of a firearm during the commission of a felony.[25]

---

[21] Maxwell v. State, 282 Ga. 22, 26 (2) (d) (644 SE2d 822) (2007) (citation omitted); see Garduno v. State, 299 Ga. App. 32, 34-35 (2) (682 SE2d 145) (2009) (where prospective juror was admittedly biased toward prosecution witness and state's questioning did not rehabilitate juror, trial court manifestly abused discretion in refusing to strike juror for cause); McGuire v. State, 287 Ga. App. 764, 765 (653 SE2d 101) (2007) (trial court abused its discretion in failing to strike juror for cause where "[t]he trial court never questioned the juror and the juror never gave an affirmative response that she would be able to follow the court's instructions that the State had to prove [defendant]'s guilt beyond a reasonable doubt and that he had no burden to put forth proof of his innocence"); see also Perry v. State, 264 Ga. 524, 525 (2) (448 SE2d 444) (1994) (where prospective juror is not impartial and free from prejudice or bias, that juror is subject to be excused for cause; trial court did not abuse its discretion in excusing clearly biased juror).

[22] Maxwell, supra.

[23] Id. at 26, n. 12 (If a defendant is denied a full panel of qualified jurors, his conviction must be reversed.).

[24] Id. at 27 (2) (e).

[25] See generally Rankin, supra; see also Scott, supra (armed robbery); Mitchell, supra

5. Lester contends that the trial court erred in denying his motion to sever his trial from that of his co-defendant.[26]

A trial judge has discretion to grant severance based on the particular facts of the case and should do so whenever it appears necessary to guarantee the defendant a fair trial.[27] When exercising its discretion, the trial court should consider factors such as:

> 1. Will the number of defendants create confusion of the evidence and law applicable to each individual defendant? 2. Is there a danger that evidence admissible against one defendant will be considered against another despite the admonitory precaution of the court? 3. Are the defenses of the defendants antagonistic to each other or to each other's rights?[28]

"If the defendant can show the court by some facts that failure to sever will prejudice him under one or more of these considerations, his motion should probably be granted."[29] But an appellate court will not find that the denial of a motion for severance was an abuse of discretion unless it appears that the defendant suffered prejudice that amounted to a denial of due process.[30]

(a) Lester challenges the trial court's determination on the second factor, danger that evidence admissible against a co-defendant will be considered against him, asserting that a violation of *Bruton v. United States*[31] occurred during an investigator's cross-examination. The specific exchange was as follows:

> COUNSEL FOR HAM: You didn't do a gun powder test. You didn't do a photo line-up. You didn't do a physical line-up. You didn't do any ballistics matching. You didn't do any sketches. I asked you at the hearing before what evidence you had to connect my client to the scene, and your answer was a white t-shirt; isn't that true?
>
> INVESTIGATOR: If that's what's on the transcript. I don't recall everything that was [said] verbatim at that hearing.

---

(burglary); *London*, supra (aggravated assault); *Howze*, supra (possession of a firearm during commission of a felony).

[26] Although the motion to sever was filed by Ham, counsel for Lester verbally joined the motion before the trial court denied it.

[27] *Cain v. State*, 235 Ga. 128, 129 (218 SE2d 856) (1975).

[28] Id. (citation omitted).

[29] Id.

[30] *Owen v. State*, 266 Ga. 312, 314 (2) (467 SE2d 325) (1996).

[31] 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968).

> COUNSEL FOR HAM: Let me ask you this then: Do you have any other evidence, other than the fact that my client had a white t-shirt and was shot to prove that he's —
> INVESTIGATOR: Other statements made by other individuals involved, yes, sir.
> COUNSEL FOR HAM: What other individuals? Are —
> INVESTIGATOR: His co-defendant, sir.
> COUNSEL FOR HAM: The co-defendant?

At that point, Lester's counsel objected, followed by Ham's counsel. After an extensive discussion with the court outside the jury's presence, counsel for both defendants moved for mistrial. The trial court admonished the investigator not to talk about the other defendant and denied the motions for mistrial. Upon the jury's return to the courtroom, the court instructed that out-of-court statements by one defendant may be considered only against the person who made the statement and only if the jury found the statements were freely and voluntarily made.

> Under the Confrontation Clause of the Sixth Amendment, a criminal defendant has the right to confront witnesses against him and to cross-examine them. Generally, when a jury is instructed that certain testimony or evidence may only be considered against a co-defendant, the jury is presumed to follow the court's instruction and the testimony or evidence is not "considered to be . . . 'against' [the] defendant." In *Bruton,* however, the Supreme Court "recognized a narrow exception to this principle," by holding that when a facially, "powerfully incriminating" statement of a non-testifying co-defendant is presented to the jury, the risk is so great the jury will ignore the limiting instruction and consider the co-defendant's confession against the defendant that the general rule cannot be followed. The Court thus held that the introduction of such statements, even with a limiting instruction, violates the defendant's right of confrontation.[32]

Where a co-defendant's statement does not directly incriminate the defendant, but does so only when linked with other evidence introduced at trial, the "generalization that the jury will not likely obey the instruction to disregard the evidence" is less valid.[33] In

---

[32] *Moss v. State*, 275 Ga. 96, 98 (2) (561 SE2d 382) (2002) (citations omitted).
[33] *Richardson v. Marsh*, 481 U. S. 200, 208 (II) (107 SC 1702, 95 LE2d 176) (1987).

accordance with this principle, the Supreme Court of Georgia has held that

> *Bruton* only excludes statements by a non-testifying co-defendant that directly inculpate the defendant, and that *Bruton* is not violated if a co-defendant's statement does not incriminate the defendant on its face and only becomes incriminating when linked with other evidence introduced at trial.[34]

The detective's testimony about the existence of a co-defendant's statement as evidence did not, standing alone, directly incriminate Lester. Moreover, the comment referred to evidence in Ham's case, not Lester's case. Accordingly, we conclude that no *Bruton* violation occurred,[35] and that the trial court did not err in denying Lester's motion to sever.[36]

(b) Lester complains that one judge initially heard the motion to sever, reserved ruling, and then another judge ruled on the motion. Lester's contention that the second judge was unprepared to rule on the motion is unsupported by citation of authority; moreover, it is not supported by the record. Before ruling on the motion to sever, the second judge heard argument from counsel, reviewed the motion and the cases cited therein, reviewed the initial judge's order on this issue and conducted his own review. This claim lacks merit.

6. Lester contends that his trial counsel was ineffective in several respects.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[37] There are two components to this inquiry:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said

---

[34] *Moss*, supra (citations omitted).

[35] See id. at 99.

[36] See id.

[37] *Strickland v. Washington*, 466 U. S. 668, 686 (II) (104 SC 2052, 80 LE2d 674) (1984).

that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.[38]

When reviewing a trial court's ruling on trial counsel's effectiveness, "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts."[39]

(a) Lester contends his trial counsel was ineffective in failing to object to the following part of the state's closing argument:

> As I was sitting here listening to both of these fine attorneys for their closing argument, I couldn't help but think what a great country we live in. What a great country we live in. You can bust into somebody's home, put them on the ground at gunpoint, take whatever you want, run away from them, women and children in the home, get shot, show up at a hospital. Do they let you bleed to death there? No. They treat you. They treat you. And they make you better.
>
> And then when you get better you get an attorney. You're not summarily thrown into a prison or gulag. You have an attorney who gets to represent you, who is sworn not to represent truth, but to represent you. You get to put the police on trial. You get to put the very people you robbed and put guns on trial. What a great country we live in. You can walk into a hospital wearing a color coordinated outfit with a gunshot wound, a glove on July 13th. What a great country we live in.
>
> As I listen to the defense attorneys here, I was wondering during the trial when they were going to stop prosecuting Shannon Moore and start representing their clients, defending their clients.

Lester argues that these remarks inferred that his counsel was appointed instead of retained. The prosecutor's remarks about getting an attorney, however, are ambiguous regarding whether the defendant was being provided an attorney without charge or was going to pay for an attorney. Thus, the prosecutor's comments did not constitute "statements of prejudicial matters which are not in evidence," as would be precluded by OCGA § 17-8-75.

Lester argues that these remarks also implied that his counsel was misrepresenting the facts and inappropriately challenged his

---

[38] Id. at 687 (III).
[39] *Suggs v. State*, 272 Ga. 85, 88 (4) (526 SE2d 347) (2000) (citation omitted).

counsel's strategy. In this case, the failure to sustain any objection to the prosecutor's remarks would not have been error as "the permissible range of argument during final summation is very wide."[40]

Because the prosecutor's remarks were not impermissible, objection to those remarks would have lacked merit. "Failure to make a meritless objection cannot be evidence of ineffective assistance."[41]

(b) Lester argues that his trial counsel should have objected when one judge initially heard the motion to sever and reserved ruling, and then another judge ruled on the motions. Because this was not objectionable,[42] and the trial court did not err in denying the motions to sever,[43] no deficient performance has been shown here.[44]

(c) Lester argues that his trial counsel performed deficiently when he placed him at the scene of the crime in his opening statement. Specifically, trial counsel stated that Lester never denied being there, but that he was just trying to buy some marijuana, and that he ended up being in the wrong place at the wrong time. At the motion for new trial hearing, Lester's trial counsel explained that his argument was part of their trial strategy because he knew marijuana had been found in the apartment, it was consistent with Ham's explanation of why he was there and it provided some explanation of "why he was in an apartment complex that he had no relation to." The defense's strategy was not that Lester was at a different apartment complex, but that two groups of young men were at the same place very close in time. Given the evidence presented at trial, that strategy was not "so patently unreasonable that no competent attorney would have chosen [it]" and did not equate with ineffective assistance of counsel.[45]

(d) Lester argues that his trial counsel should have allowed him to testify. At the motion for new trial hearing, trial counsel testified that it was Lester's choice not to testify, but that he had pointed out to his client that it appeared that the state had not met some of its burdens and that if Lester testified, it might allow the state to fill in some of the holes in its case. At the close of the state's case, the trial court explained to both defendants their right to testify. Lester acknowledged that he understood his right, that he had discussed the issue with his counsel and that he did not wish to testify.

"Although a criminal defendant has a constitutional right to

---

[40] *Gissendaner v. State*, 272 Ga. 704, 713 (10) (a) (532 SE2d 677) (2000) (citation and punctuation omitted).

[41] *Moore v. State*, 278 Ga. 397, 401 (2) (e) (603 SE2d 228) (2004) (citation and punctuation omitted).

[42] See Division 5 (b), supra.

[43] See Division 5 (a), supra.

[44] See generally *Moore*, supra.

[45] *Terrell v. State*, 276 Ga. App. 102, 104 (2) (622 SE2d 434) (2005) (citation omitted).

testify in his own defense, the decision whether to testify is considered to be a tactical one to be made by the defendant after consultation with his counsel."[46] Based on the representations made by Lester at trial and the testimony at the motion for new trial hearing, the trial court was authorized to conclude that Lester was not denied his right to testify and was therefore not denied effective assistance of counsel.[47]

*Judgment reversed in Case No. A09A1967. Judgment affirmed in part and reversed in part in Case No. A09A1968. Smith, P. J., and Bernes, J., concur.*

DECIDED MARCH 29, 2010 —

*Gary W. Jones*, for appellant (case no. A09A1967).
*Gina A. Smalley*, for appellant (case no. A09A1968).
*Patrick H. Head, District Attorney, John R. Edwards, Assistant District Attorney*, for appellee.

---

[46] *Thomas v. State*, 254 Ga. App. 226, 230 (5) (a) (561 SE2d 444) (2002).
[47] See id.