**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER, and RAY, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 18, 2013**

# In the Court of Appeals of Georgia

A13A0395. BATES v. THE STATE.

BARNES, Presiding Judge.

A jury found Darrin L. Bates guilty of entering an automobile with intent to commit theft, two counts of burglary, aggravated battery, and theft by taking. On appeal, Bates claims that (1) the evidence was insufficient to support the verdict; (2) the trial court erred in denying his motion to change venue; (3) the trial court erred in denying his motions to strike seven prospective jurors for cause; (4) the trial court erred in denying his motion to suppress the pretrial and in-court identifications by the second victim; (5) the trial court erred in overruling his hearsay objection to the introduction of a latent fingerprint card; and (6) that he received ineffective assistance of trial counsel. For the reasons that follow, we find that Bates's claims of error have no merit and affirm.

Following a criminal conviction, the defendant is no longer presumed innocent, and we view the evidence in the light most favorable to the jury's verdict. See *Reese v. State*, 270 Ga. App. 522, 523 (607 SE2d 165) (2004). So viewed, the evidence shows that Bates escaped from the Hancock County jail on or about June 27, 2006. That same day in Baldwin County someone entered the pickup truck of the first victim and took a hunting knife. Three days after the escape, the second victim arrived at his Baldwin County lake house and noticed that the door jam was broken loose. The second victim entered the house and saw an intruder standing approximately twenty to twenty-five feet away in "plenty of light." The second victim later identified the intruder as Bates from a photographic lineup and at trial.

After the second victim and Bates looked at each other for between three to five seconds, Bates fled. The second victim found the first victim's hunting knife lying on top of the washing machine. He discovered that Bates had eaten some of the food in the house. Over the course of time, the second victim also noticed that several things had been taken from his lake house, including a tooth brush, a kitchen knife, and a spoon.

The day after the second victim discovered Bates in his lake house, a man came to the back door of the third victim's Baldwin County residence. The third victim, an

elderly woman who lived alone, identified that man as Bates during her trial testimony. After the third victim cracked the door open, Bates pushed into her home and beat her severely. The trauma from the beating damaged the third victim's optic nerve and caused her to lose the sight in her left eye. After the beating, Bates tied the third victim up and left the scene in her 1999 Chevrolet Lumina. The third victim's son found

the second victim's kitchen knife lying on the floor of his mother's house.

Later that month, the third victim's Lumina was towed to police headquarters in Philadelphia, Pennsylvania after the Philadelphia police determined that Baldwin County had placed a "hold" on the car. Per Baldwin County's request, the Philadelphia police processed the Lumina for evidence. The Philadelphia police officer who testified at Bates's trial observed his partner lift a fingerprint off of the car's rearview mirror and then hand the testifying officer the latent impression card. An expert in fingerprint analysis took Bates's fingerprints and later testified that the print on the card identified by the Philadelphia police officer matched the right thumb of the known print card that the expert had personally collected from Bates.

Following the trial, the jury found Bates guilty of the charged offenses of entering an automobile, two counts of burglary, aggravated battery, and theft by

taking. The trial court later denied Bates's motion for new trial, and Bates filed this appeal.

1. Bates asserts, without argument or elaboration other than his description of the evidence presented at trial, that the verdict is contrary to the evidence and without support, strongly against the weight of the evidence, and contrary to law and the principles of justice and equity, and that the trial court accordingly erred in failing to grant his motion for new trial. We disagree. When the sufficiency of evidence is challenged, including in a challenge to the overruling of a motion for new trial, the proper test is established by *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See *Short v. State*, 234 Ga. App. 633, 634 (1) (507 SE2d 514) (1998). Under *Jackson* we do not weigh the evidence or determine the credibility of witness, but, viewing the evidence in a light most favorable to the jury's verdict, determine whether the evidence was sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt. See *Williams v. State*, 262 Ga. App. 67, 68 (1) (584 SE2d 625) (2003). So viewed, the extensive direct and circumstantial evidence of Bates's guilt sufficed to sustain his convictions.

2. Bates contends that the trial court erred in denying Bates's motion for change of venue. We disagree.

Bates filed a pretrial motion for change of venue on the ground that the jury pool had been tainted by extensive pretrial publicity in local newspapers, radio, and television.[1] Following voir dire, the trial court heard argument on the motion and denied it. "A motion for a change of venue based upon pretrial publicity is in the trial court's discretion and its ruling will not be disturbed absent abuse of that discretion." (Citation and punctuation omitted.) *Phillips v. State*, 284 Ga. App. 224, 229 (2) (664 SE2d 153) (2007).

To prevail on a motion to change venue, "the petitioner must show (1) that the setting of the trial was inherently prejudicial or (2) that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." (Citation omitted.) *Eckman v. State*, 274 Ga. 63, 68 (4) (548 SE2d 310) (2001). Although Bates showed that the events surrounding the escape from the Hancock County jail and the subsequent robbery of the elderly third victim were widely publicized in the Baldwin County area, he failed to show that the trial's setting "was inherently prejudicial, i.e., that any publicity was factually incorrect, inflammatory, or reflective of an

---

[1] Attached to Bates's motion, as amended, were articles captioned as "Hancock escapees at large," "Jail Escapees Sought," "Stolen Car ditched in Philly," "Philly cops nab man in [third victim's] case," "Notable court trials nearing," and "Escaped inmate accused of beating elderly woman."

atmosphere of hostility." Id. Rather, the predominant, if not exclusive,[2] character of the media relied on by Bates consisted of facts which were established by evidence admitted at trial. See *Chancey v. State*, 256 Ga. 415, 430 (5) (A) (349 SE2d 717) (1986). There was "no evidence of a total inundation of the judicial process by the media at this trial." (Citation and punctuation omitted.) Id. at 430 (5) (A). Bates did not show that the trial's setting was inherently prejudicial as a result of pretrial publicity.

Nor did Bates establish that the jury selection process showed actual prejudice. Bates shows that 20 potential jurors (of 43 questioned) had some prior knowledge of the case. However, the determinative issue was not the number of jurors who had heard about the case, but whether the jurors who had heard about the case could set aside their opinions and render a verdict based on the evidence. See *Walden v. State*, 289 Ga. 845, 849 (2) (717 SE2d 159) (2011). Upon our review of the voir dire transcript, particularly those portions relied on by Bates, "we cannot say that the trial court abused its discretion in qualifying those veniremen who did ultimately testify

---

[2] One article stated that Bates was wanted on rape charges in Massachusetts and another article that he was wanted on sexual assault and rape charges in Connecticut. These assertions were not the focus of the articles or shown to have been known by the prospective jurors.

6

that they could lay aside their opinions and render a verdict based on the evidence." *Chancey*, 256 Ga. at 432 (5) (C). Although, as Bates shows, six potential jurors were struck for cause due to their fixed opinion or independent knowledge of the case, that did not require a finding that the jury selection process showed actual prejudice. See *McWhorter v. State*, 271 Ga. 461, 462 (2) (519 SE2d 903) (1999) (finding no error in denial of defendant's motion for change of venue where, although virtually all venire members were familiar with the case, only five jurors were excused for cause for having a fixed opinion about the defendant's guilt, and the remaining prospective jurors who had been exposed to pretrial publicity indicated they could render a decision based on the evidence); *Chancey*, 256 Ga. at 432 (5) (C) (even though 40 percent of the venire was excused for cause due to prejudice against the defendants, this did not demand a finding of actual prejudice in the jury selection process). The trial court did not abuse its discretion in denying Bates's motion for change of venue.

3. Bates also claims that the trial court erred in failing grant his motions to strike seven prospective jurors for cause. We disagree.

Before a potential juror can be disqualified for cause, the challenger must show that a potential juror's opinion "is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's

7

charge upon the evidence." (Punctuation and citation omitted.) *Mosely v. State*, 269 Ga. 17, 19 (2) (495 SE2d 9) (1998). A trial judge's decision concerning juror qualification may be reversed only upon a finding of manifest abuse of discretion. *Ham v. State*, 303 Ga. App. 232, 239 (2) (a) (692 SE2d 828) (2010). However, when the record shows on its face that a potential juror has a compelling interest or bias in the case, "the record must show more than the potential juror's own statement that he can render a decision based on the evidence in order to support a trial court's denial of a motion to strike this juror for cause." *Garland v. State*, 263 Ga. 495, 497 (1) (435 SE2d 431) (1993). See *Lively v. State*, 262 Ga. 510, 511 (1) (421 SE2d 528) (1992) (finding that notwithstanding that the prospective juror testified that he could be fair and impartial, where the prospective juror had been the deceased victim's employer, had served as a pall bearer at her funeral, and he had discussed with the deceased her relationship with the defendant, the record did not support the trial court's finding that the prospective juror could render an impartial verdict).

(a) Bates contends that the trial court erred in failing to grant his motions to strike prospective jurors W. B., T. G., and T. H. for cause because they knew much about the case and because the trial court accepted the jurors' testimony that they

could be fair and impartial.[3] There is, however, "no requirement that a juror be ignorant of every fact and issue involved in a case. The question is whether the juror can lay aside any impressions he may have and reach a verdict based on the evidence presented at trial." *Robertson v. State*, 268 Ga. 772, 774 (6) (493 SE2d 697) (1997). Each of these prospective jurors had some prior knowledge of the case, but they all maintained that they could be fair and impartial, and they did not profess to have a fixed opinion as to Bates's guilt.[4] Nor were the prospective jurors shown to have such a compelling interest or bias in the case that the record must show more than the potential juror's own statements that he or she could render a decision based on the evidence. See *Garland*, 263 Ga. at 497 (1). We find no abuse of discretion.

---

[3] Although the defense did not use all of its peremptory strikes, this did not render these alleged errors necessarily harmless. See *Wallace v. State*, 275 Ga. 879, 881 (3) (572 SE2d 579) (2002) (finding that in evaluating the harm caused by the refusal to strike an unqualified juror, the defendant's use of his peremptory strikes no longer plays a role).

[4] T. H. agreed that because he had some knowledge of the case it would be "difficult" to be fair to both sides, but he denied that he would accordingly lean to one direction. Rather, according to T. H., "it would mean that I would just try to hear all the information that was gathered." T. H. then confirmed that, setting aside anything he might have heard before, he would make a decision based strictly on the evidence. See *Corza v. State*, 273 Ga. 164, 166-167 (3) (539 SE2d 149) (2000) (finding that "[a] prospective juror's doubt as to his or her own impartiality does not demand as a matter of law that he or she be excused for cause").

(b) Bates also contends that the trial court erred in denying his motions to strike prospective jurors R. B., D. S., D. T., and M. B. for cause because they knew much about the case, they knew the victim, and the trial court accepted the jurors' testimony that they could be fair and impartial. Prospective juror R. B. had read about the case in the local newspaper, and he knew members of the third victim's family with whom he had attended high school, but he explained that he had not seen them in years and could be fair to both sides in the case. Prospective juror D. S. knew the third victim's next door neighbor, and he had heard about the case from those neighbors and from reading the newspaper, but he maintained he could be open minded and determine guilt and innocence based strictly on the evidence. Prospective juror D. T. had seen an article about the case in the newspaper, knew members of the third victim's family to the extent that she could recognize them, and one member of the third victim's family lived near her, but she did not know any of the victim's family personally, and she testified that she could be fair to both sides. Prospective juror M. B. lived next door to a family member of the third victim. M. B. had read about the case in the newspaper, and she was concerned that her elderly great grandmother lived on the same road as the third victim. She also recounted that her aunt, unaware of any trouble, had seen and driven by the third victim on the day of the robbery. But juror

10

M. B. also maintained that she could be fair to both sides and would make any decision based on the evidence.

Notwithstanding their knowledge of the some of the facts of the case and their familiarity with the victim's family or neighbor, the trial court could conclude that these prospective jurors could be impartial and fair to both sides. Even if "a juror knows a victim[, this] does not require dismissal for cause if the juror indicates that he can be fair and impartial and decide the case on the basis of the evidence presented." *Davis v. State*, 229 Ga. App. 787, 788 (1) (a) (494 SE2d 702) (1997) (juror's acquaintance with victim's father did not render the juror partial as a matter of law where juror represented that he could be fair and impartial to both sides). Prospective jurors R. B., D. S., D. T., and M. B. were not shown to have a compelling interest or bias in the case, and they indicated that they could be fair and impartial. See *Garland*, 263 Ga. at 497 (1). Accordingly, we find no abuse of discretion in the trial court's denial of Bates's motions to dismiss these prospective jurors for cause.

4. Following an evidentiary hearing, the trial court denied Bates's motion to suppress the pretrial photographic lineup and the subsequent in-court identification of Bates by the second victim, finding the identification sufficient to meet the requirements of *Neal v. Biggers*, 409 U. S. 188 (93 SCt 375, 34 LE2d 401) (1972).

11

Bates contends that the trial court erred in denying his motion to suppress because the detective who conducted the photographic lineup tainted the identification when he told the second victim "that's him" after he picked Bates's photograph from the array. The State acknowledges that the detective should not have affirmed to the second victim that he had picked the correct suspect, but argues that under the totality of circumstances there was no substantial likelihood of irreparable misidentification as would require Bates's convictions be set aside. We agree with the State.

Our Supreme Court has said that, because it may lead to improper tainting of a later in-court identification, it is not good practice in the course of a pretrial lineup to indicate to a witness that he or she has chosen the "right" person. *Dodd v. State*, 236 Ga. 572, 573 (224 SE2d 408) (1976). Nevertheless, "whether a subsequent in-court identification is tainted depends on all the circumstances of each case." Id. And "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (Citation and punctuation omitted.) Id. See *Graham v. State*, 273 Ga. App. 187, 188-189 (1) (a) (614 SE2d 815) (2005).

12

In determining whether there was a very substantial likelihood of irreparable misidentification, factors to be considered

> include: (1) the witness's opportunity to view the accused at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the accused; (4) the witness's level of certainty at the confrontation with the accused; and (5) the length of time between the crime and the confrontation.

(Citations omitted.) *McBride v. State*, 291 Ga. 593, 594-595 (2) (732 SE2d 757) (2012). The question is ultimately "whether under the totality of the circumstances, the identification is reliable." (Citations omitted.) Id. at 595 (2). See *Neal*, 409 U. S. at 199. "[I]n evaluating these factors, the trial court is the trier of fact and must judge the credibility of the witnesses and the weight and conflict in the evidence. Where evidence supports the trial court's ruling, we will not disturb that ruling." (Footnote omitted.) *Jones v. State*, 273 Ga. 213, 216 (2) (539 SE2d 143) (2000).

The evidence shows that when the second victim arrived at his lake house with his son he realized that the door was unlocked and so he immediately pushed his son aside. He also noticed that the door jam had been broken loose. After he stepped inside he saw Bates standing approximately 25 feet away. The second victim and Bates stood and looked at each other, face to face, between three and five seconds

13

before Bates turned around and ran. There was "plenty of light," as it was daytime and there were windows on the side of the house where Bates was standing. The second victim then gave a description of the intruder to police shortly after the burglary. As Bates points out, the second victim picked Bates's picture from the photographic lineup approximately six months after the burglary. However, the second victim confirmed that he chose Bates's photograph from observing the intruder at the time of the burglary, explaining that "when you come face to face . . . there's certain features that . . . stand out in your mind." The second victim also testified that during the course of his 19 years of work as a banker he had received training, normally twice a year, "to recognize somebody at a snap type situation; height, weight, facial features, hair . . . because it may be important . . . later on." Considering the totality of circumstances, including that the second victim had the opportunity to focus on Bates's face for several seconds in good light and then maintained that his identification was based on this encounter and consistent with his training, the evidence supports the conclusion that, notwithstanding that the detective improperly indicated to the second victim that he had chosen the correct suspect from the photographic array, the pretrial identification procedure did not give rise to a very substantial likelihood of irreparable misidentification. See *Johnson v. State*, 234 Ga.

14

App. 21, 22 (2) (506 SE2d 189) (1998) (notwithstanding claim of improper pretrial showup procedure, affirming trial court's decision to allow in-court identification by the victim where, among other things, the victim saw the robber in good light for a second or two and, as a result of his training, was able to focus his attention on the robber's appearance). Accordingly, the trial court did not err in denying Bates's motion to exclude the second victim's pretrial and in-court identifications. See *Graham*, 273 Ga. App. at 189 (1) (a).

5. Bates further argues that the trial court erred in overruling his hearsay objection to the entry into evidence of the latent fingerprint card. Again, we disagree.

The officer who lifted the latent fingerprint from the rearview mirror window of the Lumina did not testify at trial. However, a Philadelphia police officer observed his partner take the print from the mirror. When asked to identify the latent impression card, the observing officer testified that "[t]his is the card" that his partner handed to him after lifting the fingerprint off the mirror. He explained that the latent fingerprint card was "the actual card, the actual lift that my partner lifted off the mirror." Bates contends that the card was inadmissible hearsay because the person

15

who took the latent print was not available at trial.[5] Hearsay is "testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of the matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." *Miness v. Miness*, 254 Ga. 658, 659 (1) (333 SE2d 574) (1985) (quoting McCormick on Evidence, 2nd ed., § 246, p. 584 (1972)).[6]

Here, the card at issue simply shows an image of part of a window with fingerprints thereon, and it did not contain any representations or conclusions of a third party,[7] nor did it purport to be the fingerprint card of any particular person.

---

[5] Bates's counsel objected to the introduction of the card on the grounds of improper bolstering, a lack of a proper chain of custody, and hearsay, but Bates's claim of error and argument on appeal is that the fingerprint card was improper hearsay.

[6] At the time of Bates's trial, former OCGA § 24-3-1 (a) defined hearsay as evidence "which does not derive its value solely from the credit of the witness but rests mainly on the veracity and competency of other persons." Under the new evidence code, effective January 1, 2013, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801 (c).)

[7] There was apparently some writing on the back of the card, although it is not part of the record. According to the testifying witness, he was the one who "filled out the back of the card." The trial court allowed the fingerprint card into evidence because he agreed with the State that the "face of the card" was admissible, but he indicated that they would "deal with the back side later." The trial court subsequently

16

Compare *Tubbs v. State*, 283 Ga. App. 578 (642 SE2d 205) (2007) (affirming the admission under hearsay exception of a copy of an inked fingerprint card bearing the name of the defendant). Although the testifying officer did not actually take the fingerprint impression, he could confirm based on personal observation that the tendered exhibit was "the actual lift" of fingerprint impressions from the Lumina's rearview mirror. Neither the testimony of the officer, nor the latent fingerprint card, was hearsay. See, e. g., *Caldwell v. State*, 230 Ga. App. 46, 47 (495 SE2d 308) (1997) (testing printouts produced by a machine during its most recent quarterly inspection was not statement or conclusion of third party and so did not constitute hearsay); *Scott v. State*, 130 Ga. App. 75, 78 (3) (202 SE2d 201) (1973) ("[b]ecause the [witness's] testimony was based upon his personal observation it was not hearsay").

6. Lastly, we consider Bates's claim that he received ineffective assistance of trial counsel. If not "clearly erroneous, we will uphold a trial court's factual determinations with respect to claims of ineffective assistance of counsel. A trial court's legal conclusions in this regard, however, are reviewed de novo." (Footnotes omitted.) *Tyner v. State*, 313 Ga. App. 557, 565 (6) (722 SE2d 177) (2012).

---

directed that the front side of the card be photocopied, and he explained to the jury that they would not have access to the back of the card.

17

To establish ineffective assistance, Bates "must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different." (Citations and punctuation omitted.) *Towry v. State*, 304 Ga. App. 139, 143 (2) (695 SE2d 683) (2010). In that respect, "[w]e need not address both the deficient performance and prejudice prongs of the test if the defendant has made an insufficient showing on either prong." Id. Further, "[t]o establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." (Citation and punctuation omitted.) *Brown v. State*, 288 Ga. 902, 907 (5) (708 SE2d 294) (2011). In considering an ineffective assistance claim, a court "must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." (Citation and punctuation omitted.) Id.

(a) Bates contends that his trial counsel, having sufficient peremptory strikes to do so, was ineffective in failing to strike jurors W. B. and T. H. after counsel's motions to strike these jurors for cause was denied. At the hearing on motion for new trial, defense counsel explained that he did not use a peremptory strike on W. B. because although she had some knowledge of the case through exposure to television

18

and newspapers, he did not believe she had a relationship with the family of the third victim, and he wanted to "hang onto" his strikes at that point in the selection process. As to T. H., defense counsel testified that although the juror had "some exposure" to newspaper accounts of the crime, T. H. had no ties to the third victim's family. Defense counsel could not recall why he did not strike T. H., "unless [he] was still thinking at that point that [he] needed to hold" further strikes in reserve. Given the presumption that counsel's representation falls within the range of reasonable professional assistance, counsel's testimony at the hearing on motion for new trial, and our review of the voir dire of W. B. and T. H., Bates has not shown that his trial counsel was deficient. "The use of peremptory strikes is a matter of trial strategy, and [Bates] has failed to carry his burden to show that counsel's use of his strikes was not reasonable." (Footnote omitted.) *Hardnett v. State*, 285 Ga. 470, 475-476 (7) (678 SE2d 323) (2009).

(b) Bates also argues that his trial counsel was ineffective in failing to put forth any mitigation evidence on his behalf. However, defense counsel testified that he did not have any mitigation evidence to present on Bates's behalf. Defense counsel explained that there were no relatives or local community members who could offer such evidence. And Bates did not proffer any evidence in mitigation that counsel

might have presented. Accordingly, "we cannot find that counsel's failure to present mitigation evidence was deficient or that it prejudiced [Bates's] case." (Footnote and punctuation omitted.) *Tyner*, 313 Ga. App. at 566 (6) (e).

(c) Bates further argues that his counsel's errors, taken together, show a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different. See *Schofield v. Holsey*, 281 Ga. 809, 811-812 (II) (642 SE2d 56) (2007). However, Bates fails to show any deficiencies on the part of his trial counsel, much less cumulative deficiencies. Accordingly, he does not show that he received ineffective assistance of trial counsel.

*Judgment affirmed. Miller and Ray, JJ., concur.*