304 Ga. 686
FINAL COPY

S18P0915.  WILLIS v. THE STATE.

BENHAM, Justice.

A jury convicted Demetrius G. Willis of three counts of malice murder

and numerous related offenses.  After finding beyond a reasonable doubt

multiple statutory aggravating circumstances, the jury recommended death

sentences for the murder convictions, and the trial court entered judgment

accordingly.  See OCGA §§ 17-10-30, 17-10-31 (a).  Willis's motion for a

new trial was denied, and he appeals his convictions and sentences.[1]  For the

---

[1]

The crimes occurred on June 28, 2004.  Willis was indicted on July 16, 2004, by a Fulton County grand jury on three counts of malice murder, nine counts of felony murder, six counts of aggravated assault with a deadly weapon, and one count each of burglary, first degree child cruelty, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony.  The State filed written notice of its intent to seek the death penalty on September 27, 2004.  Jury selection began on May 28, 2008, and the trial of the case began on June 26, 2008.  At trial, the trial court directed a verdict of acquittal for the count of aggravated assault of J. H.  On July 9, 2008, the jury returned guilty verdicts on the remaining counts of the indictment with the exception of the burglary count and the three counts of felony murder predicated on burglary.  On July 14, 2008, the jury recommended death sentences for the malice murders, and the trial court sentenced Willis accordingly.  See OCGA § 17-10-31 (a).  Although the trial court purported to "merge" the felony murder verdicts into the malice murder verdicts, "the trial court merely used incorrect nomenclature, as these verdicts did not 'merge' into the malice murder verdict[s] but rather were vacated by operation of law."  Favors v. State, 296 Ga. 842, 847-848 (5) (770 SE2d 855) (2015).  See Malcolm v. State, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993); OCGA § 16-1-7.  The trial court merged the first degree child cruelty verdict into the aggravated assault verdict involving the same victim and imposed a concurrent twenty-year sentence for each of the five aggravated assault convictions.  However, the trial court should have also merged three of the aggravated assault verdicts with the

reasons set forth below, we vacate Willis's convictions and sentences for three counts of aggravated assault with a deadly weapon, but we affirm all of Willis's remaining convictions and sentences, including his death sentences for the murders.

Evidence of Guilt

1. The evidence, construed in the light most favorable to the jury's verdicts, showed the following. Willis, who goes by the nickname of "Sweet Pea," is from Clarksdale, Mississippi, and was living in that area at the time of the murders. He and Talisa Hankins, who was also from Clarksdale, had a daughter together, Q. H. Hankins had three more children with Jerry Williams, Jr.: J. H., C. H., and Jerry Williams III. In the spring of 2004, Williams took a job with his father, and he, Hankins, five-year-old C. H., and three-year-old Jerry III moved together into a new home in Atlanta, Georgia. Ten-year-old Q. H. and six-year-old J. H. remained in Clarksdale with their maternal grandmother in order to complete the school year there.

corresponding malice murder verdicts. See Division 2 below. The trial court imposed a concurrent five-year sentence for possession of a firearm by a convicted felon and a consecutive five-year sentence for possession of a firearm during the commission of a felony. Willis filed a motion for a new trial on July 14, 2008, which he amended on October 28, 2013, and June 6, 2014, and which the trial court denied in an order filed on November 12, 2014. Willis filed a notice of appeal on December 9, 2014. After the appeal was docketed in this Court as Case No. S18P0053, the case was stricken from the docket and remanded to the trial court for completion of the record. The instant appeal was docketed for the April 2018 term of this Court and was orally argued on June 4, 2018.

On Friday, June 25, 2004, Willis and a friend, Nakia Dukes, rode from Clarksdale to Atlanta with Willis's cousin, Reginald Greenwood, in Greenwood's 1996 black Chevrolet Impala. Dukes brought a nine millimeter Astra handgun "for [his] protection," which he showed to Willis and Greenwood and then placed in a compartment behind the Impala's glove box. While in Atlanta, the three men slept at the home of Mary Raindrop, Willis's girlfriend, who lived in Canton. However, they spent much of their time in Atlanta socializing with various friends.

On the afternoon of Sunday, June 27, 2004, the three men attended a cookout at Hankins and Williams's new home in Atlanta. No one noticed anything unusual about Willis's interactions with Hankins or Williams or observed any arguments or animosity between Willis and the couple. After leaving the cookout, Willis, Greenwood, and Dukes visited the home of Ray Hollins and his girlfriend, Timirial Jordan. Hollins was a close friend of both Willis and Williams. Willis, Greenwood, Dukes, Hollins, and Jordan all went out together in Greenwood's Impala. After spending the night drinking, smoking marijuana, and attending clubs, they returned to Hollins's home at approximately 5:00 a.m. on Monday, June 28. Shortly after their return, Willis asked Hollins to ride with him to Hankins and Williams's home so

that Willis could see his daughter Q. H. before he returned to Mississippi, as Williams's parents had traveled to Clarksdale on Sunday afternoon with plans to return to Atlanta that night with Q. H. and J. H. so that the girls could join the rest of the family in their new home. Hollins agreed to accompany Willis, and, after borrowing the keys to the Impala from Greenwood, the two men left.

Hankins and Williams's home was only two or three blocks away, and Willis drove the short distance while Hollins sat beside him in the front passenger seat. Hollins testified that Willis did not appear upset and that he did not see a gun. Once they arrived, Hollins remained in the Impala while Willis got out, walked around the vehicle and up the steps to the house, and entered through the front door that opened into the living room. Then Hollins heard Hankins exclaim, "Sweet Pea, what's wrong with you?" followed by a gunshot. At that time, he saw that "the whole frame" of one of the home's windows "was just knocked off." Frightened, Hollins got out of the vehicle and "t[ook] off running" away from the house. Before he had gone very far, however, he turned around and started walking back toward the house, and he saw Willis at the top step of the porch. As Hollins approached, he saw that Willis had a black pistol in his hand and blood on his

face and shirt, and Hollins asked Willis, "Sweet Pea, what you done did?" Willis answered, "I done killed everybody in the house." Hollins asked Willis why, but Willis never responded. Instead, he got back into the driver's seat of the Impala. Hollins got into the rear passenger seat directly behind him, and they rode back to Hollins's house in silence.

Once the two men pulled up at Hollins's residence, Hollins stopped Willis from coming inside, and he went into the house and told Greenwood and Dukes that they had to leave. When the two men got into the Impala with Willis, who was now sitting in the rear seat, Greenwood saw that Willis had specks of blood on his shirt and asked Willis whether he was alright. Willis indicated that he was. As they headed to Raindrop's house in Canton, Greenwood continued to question Willis, who finally said that "he had shot some folks." Later, Willis said that "he had shot Jerry and Lisa and the kids." According to Dukes, Willis explained:

> [H]e had knocked on the door and . . . was let in and he sat down on the couch and like nudged Jerry, told him to wake up, and he didn't wake up so he shot him. Then he caught the baby's momma trying to go out the window and he shot her.

When Greenwood asked Willis whether the shootings were something "that's going to come back on [them] like real quick," Willis assured him, "[N]ah, it wasn't no — it wasn't no dirty type of thing."

After Willis and his companions had left Hollins's residence, Hollins told Jordan what had happened. She did not believe Hollins and convinced him to return to Hankins and Williams's home with her. When they pulled up to the house and Jordan saw that one of the windows was "burst out," she called Williams's cell phone, and Q. H. answered. Jordan asked her where her mother was, and Q. H. said that she was asleep. Then Jordan asked her where Williams was, and Q. H. said that she thought that he was dead. Q. H. also told Jordan that her little brother "had some stuff hanging out of his head." Jordan told Q. H. to call 911. When she learned that Q. H. did not know the home's address to provide to police, Jordan backed up her vehicle so that she could shine her headlights on the mailbox and read the address to Q. H. After hanging up, Jordan moved her vehicle to the opposite side of the street, and she and Hollins waited outside for help to arrive as a crowd of neighbors gathered. However, because they were scared, they did not speak to the police at the scene or contact the police later. Instead, they drove

home, retrieved some clothes, and went to a friend's house, where they stayed until Willis was in police custody.

Q. H. made two calls to 911. The first call came from a cell phone at 5:42 a.m. and was disconnected after Q. H. told the operator that she did not know the address of the home where she was. In the second call at 5:54 a.m., Q. H. gave the operator her correct address, and she said that everyone in her house had been shot and identified her father as the shooter. When police arrived, they discovered Williams's body lying face down on the couch in the living room with what were later determined to be three gunshot wounds to the back of the head. Hankins's body was lying face down on the floor in a bedroom adjacent to the living room. She had sustained a contact or near-contact gunshot wound to the back left shoulder that had exited through the chest and two gunshot wounds to the back of the head. The window above Hankins's body was broken from the inside with the upper portion of the screen pushed out. The blood pattern evidence and a cut to Hankins's right-hand finger suggested that she was shot in the shoulder at close range while trying to escape through the window and then suffered the two gunshot wounds to the back of the head as she lay on the floor. In the back bedroom

of the home, police found the body of Jerry III, who was lying face up across the edge of a bed with a gunshot wound to the left side of his forehead.

The three remaining children, who were in the bedroom with Jerry III when he was shot, did not suffer fatal injuries. Q. H. and C. H. testified regarding the shootings. While in the bedroom with J. H. and Jerry III, Q. H. heard her mother say, "Go on, Sweet Pea, I ain't never did nothing to you." C. H. was in the living room when she heard her mother make a similar statement to "Sweet Pea" and ask him, "[W]hy are you doing this?" Then C. H. saw Willis shoot her mother, and she ran into the bedroom where her siblings were and got into bed. Shortly after seeing C. H. dash into the bedroom and into bed, Q. H. saw Willis enter the bedroom with a black gun and start shooting. She dove under the bed and got as close to the wall as possible, but Willis still shot her in the left thigh. J. H. also hid from Willis, and she was not injured. C. H. was shot in her back left shoulder while lying in her bed. Jerry III was standing in front of his bed when Willis shot him in the head. According to Q. H., Jerry III cried for "[a] long time" after he was shot, and the medical examiner testified that, because the gunshot wound to Jerry III did not pass through any of the major structures in the brain, it was possible that he lived "for some period of time after receiving this wound."

As in her 911 call, Q. H. told responding officers that her father had shot everyone inside the home. She also identified Willis as the shooter by name, and she told them Willis's age, gave a description of him and his clothing, and said that he used a black handgun. In a brief interview with police after being transported to the hospital, Q. H. again stated that her father was the shooter, and she identified a photograph of Willis as being her father and "the one who shot [her]." The police obtained an arrest warrant for Willis and issued a lookout notice for the 1996 black Chevrolet Impala.

After Willis and his companions arrived at Raindrop's house, they slept for several hours and then left. Before heading back to Clarksdale, they stopped at a gas station in Canton, where Willis ripped up the shirt that he had worn at the time of the murders and then discarded it in a trash can. They also stopped at a wooded area somewhere in Georgia or Alabama, where Willis threw the murder weapon into some water, and they stopped at a hotel in Mississippi, where Willis's companions conducted an internet search for news stories about the crimes and then relayed the information to Willis, who stayed in the vehicle. Before reaching Clarksdale, Willis and his companions stopped at the residence of Williams's cousin, who was also a friend of Willis. After speaking with this friend, Willis agreed to ride with

him to the Clarksdale Police Department in order to turn himself in. However, before the two men reached the police department, officers stopped the Impala and learned from Greenwood and Dukes the description of the vehicle that Willis was then traveling in. Officers subsequently spotted that vehicle approximately two blocks from the police department and followed it to the department's parking lot, where Willis was arrested.

Inside the trunk of the Impala, officers discovered a pair of jeans, as well as a pair of green, yellow, and white tennis shoes that were the same size as the shoes that Willis was wearing at the time of his arrest. Multiple witnesses identified the tennis shoes as being those that Willis was wearing near the time of the murders. The back pocket of the jeans contained an empty box of the brand of cigarettes that Willis smoked, and several witnesses testified that Willis was wearing jeans near the time of the murders. Both the jeans and the tennis shoes bore high-velocity-impact bloodstains, indicating that whoever had worn those items had been in close proximity to the point of impact. DNA testing revealed that the blood on the jeans matched Williams and that the blood on the shoes belonged to Williams and Hankins. Although the murder weapon was never found, the State's ballistics expert testified that all of the projectiles recovered from the victims'

bodies were fired from the same nine millimeter pistol and that the class characteristics of the projectiles were consistent with having been fired from an Astra weapon. The State also introduced Willis's prior felony conviction for escape.

When viewed in the light most favorable to the verdicts, we conclude that the evidence was sufficient to authorize a rational trier of fact to find Willis guilty beyond a reasonable doubt of the crimes for which the jury returned guilty verdicts. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979); Unified Appeal Procedure ("U. A. P.") Rule IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence).

2. While the evidence was sufficient to support the jury's guilty verdicts and Willis raises no merger errors on appeal, the State notes that the trial court erred in sentencing Willis for the three aggravated assault counts involving the murder victims, stating that the verdicts for aggravated assault of these victims should have been merged with the corresponding malice murder verdicts. Both the malice murder and the aggravated assault counts, as indicted, were premised on the act of shooting the victims with a firearm.

In addressing this issue, we have explained:

When a victim suffers multiple wounds inflicted in quick succession, each infliction of injury does not constitute a separate assault. However, a separate judgment of conviction and sentence is authorized if a defendant commits an aggravated assault independent of the act which caused the victim's death. When a series of shots are separated by a "deliberate interval" and a non-fatal injury is sustained prior to the interval and a fatal injury is sustained after the interval, the earlier, non-fatal infliction of injury can serve to support a conviction for aggravated assault.

Coleman v. State, 286 Ga. 291, 295 (3) (687 SE2d 427) (2009) (citations omitted).

Viewed with those principles in mind, as noted in Division 1 above, the evidence with respect to Talisa Hankins suggested that she was trying to escape through the window when Willis initially shot her in the shoulder and that she then fell face down on the floor, where Willis subsequently inflicted two more gunshot wounds to the back of her head. However, the medical examiner who performed the autopsy never testified as to whether the gunshot wound to Hankins's shoulder was a fatal or a non-fatal injury, nor did she opine as to which gunshot wounds caused Hankins's death.

Even if we assume the multiple wounds were not inflicted in quick succession, in the absence of evidence that one wound was fatal and was preceded by a "deliberate interval" in the series of shots and by the infliction of non-fatal wounds, we cannot say there is evidence to support the infliction of an aggravated assault separate and apart from the malice murder.

Coleman, 286 Ga. at 295 (3) (emphasis supplied). Thus, a separate conviction and sentence for the aggravated assault of Hankins are not authorized.

With regard to the aggravated assault of Jerry Williams, Jr., the medical examiner who conducted the autopsy testified that he was not able to determine the order in which the three gunshot wounds to Williams's head were inflicted and that any one of the wounds would have caused his death. Furthermore, there is no evidence of any deliberate interval separating the infliction of any of these wounds. Therefore, a separate conviction and sentence for the aggravated assault of Williams are also not authorized. See Lowe v. State, 267 Ga. 410, 412 (1) (b) (478 SE2d 762) (1996) (stating that, where the murder resulted from the single act of firing a series of shots at the victim in rapid succession, no aggravated assault independent of the murder is shown).

As Jerry III suffered a single gunshot wound to the head, there is no evidence to suggest the occurrence of "an aggravated assault independent of the act which caused [his] death." Coleman, 286 Ga. at 295 (3). Thus, no separate conviction and sentence for the aggravated assault of Jerry III are authorized.

In sum, the verdicts for aggravated assault of the three murder victims merged into the corresponding malice murder verdicts. Therefore, Willis's convictions and sentences for aggravated assault with a deadly weapon of Hankins, Williams, and Jerry III must be vacated.

Pretrial Issues

3. Willis raises multiple challenges to Georgia's death penalty statutes. As set forth below, we find each challenge to be meritless.

(a) Willis's summary claim that Georgia's death penalty statutes result in the discriminatory application of the death penalty is meritless, because he has failed to show any invidious discrimination in his own case. See Martin v. State, 298 Ga. 259, 272-273 (3) (b) (779 SE2d 342) (2015).

(b) Willis's claim that Georgia's death penalty statutes are unconstitutional because they lack sufficient definitions of aggravating and mitigating circumstances is meritless. See Martin, 298 Ga. at 272 (3) (a).

(c) This Court's statutorily mandated proportionality review is not performed in an unconstitutional manner. See Martin, 298 Ga. at 273 (3) (d). Furthermore, it is not unconstitutional for this Court rather than a jury to conduct this proportionality review, because proportionality of punishment "is not a fact on which the legislature has conditioned an increase in the

maximum punishment or an aggravating factor" and because this Court "can only lessen or affirm the jury's sentence, it cannot increase it."  Morrison v. State, 276 Ga. 829, 835 (7) (583 SE2d 873) (2003).

(d)  There is no merit to Willis's claims that Georgia's death penalty statutes are unconstitutional because, as he argues, they fail to provide sufficient standards for district attorneys to apply in deciding whether to seek the death penalty, allow improper discretion in district attorneys' use of plea bargaining, and allow for arbitrary and disproportionate administration of the death penalty.  See Martin, 298 Ga. at 273 (3) (c).

(e)  Georgia's death penalty statutes are not unconstitutional because they do not require statutory aggravating circumstances to be set forth in indictments.  See Jones v. State, 282 Ga. 784, 790-791 (2) (653 SE2d 456) (2007).

(f)  Willis claims that Georgia's method of execution by lethal injection is unconstitutional.  Several years ago, we held that a challenge to a method of execution "is analogous to a challenge to the conditions meted out by a state officer under the authority of a sentence of imprisonment" rather than a challenge to "a criminal sentence itself" or the constitutionality of the procedure by which the sentence was imposed.  Owens v. Hill, 295 Ga. 302,

306 (2) (758 SE2d 794) (2014). We held that such claims "should be raised against the state officers responsible for such matters in the superior court where venue is appropriate for suit against them." Id. This holding in <u>Hill</u> was reached in the context of a habeas proceeding, and in cases before <u>Hill</u> we considered such claims arising out of original trial proceedings without addressing whether that was an appropriate proceeding in which to address such a claim. See, e.g., <u>Rice v. State</u>, 292 Ga. 191, 211-212 (10) (733 SE2d 755) (2012) (considering a challenge to Georgia's then-current lethal injection method on direct appeal of the original trial proceedings). See also <u>Palmer v. State</u>, 282 Ga. 466, 468 (651 SE2d 86) (2007) ("[Q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (citations and punctuation omitted)). However, having now focused on the issue, we find the following reasoning from <u>Hill</u> equally applicable in the context of a method-of-execution claim raised during original trial proceedings:

> The sentencing court's execution order in Hill's case contained nothing that dictated what drug or drugs should be used in his execution. In fact, it would have been inappropriate for the sentencing court's execution order to contain such details about the method of execution, because Georgia law specifically

delegates the task of deciding such details to the Department of Corrections. . . . The issues of what drug or drugs will be used in Hill's execution, what person or entities are involved in procuring the drug or drugs, and how information about the drug or drugs is managed do not concern the validity of Hill's death sentence; instead, they concern merely <u>how</u> his death sentence will be carried out.

Id. at 305 (2). Accordingly, we conclude that Willis's claim has not been properly raised here and warrants no relief from his death sentences.

4. Willis argues that qualifying potential jurors based on their death penalty views is unconstitutional because it produces a jury more prone to convict, impairs the proper function of the jury, and fails to produce a jury representing a fair cross-section of the community. This claim has not been preserved for appellate review, because Willis has failed to show, nor is it apparent to us, that it was ruled on in the trial court. See <u>Butts v. State</u>, 273 Ga. 760, 771 (31) (546 SE2d 472) (2001) ("Because Butts's trial counsel failed to obtain a ruling from the trial court on this issue, it is waived for purposes of appeal."). See also <u>Head v. Hill</u>, 277 Ga. 255, 269 (VI) (A) (587 SE2d 613) (2003) (holding that claims that are "so lacking in specific argument that they are incapable of being meaningfully addressed" are deemed "abandoned" under Supreme Court Rule 22). Furthermore, the claim is meritless in any case. See <u>Lance v. State</u>, 275 Ga. 11, 14-15 (5) (560 SE2d

663) (2002) ("[T]he process of qualifying potential jurors on the basis of their death penalty views is not unconstitutional.").

5. Willis argues that the general voir dire questions prescribed by OCGA § 15-12-164 are inadequate to ensure a constitutionally sound jury. This claim has not been preserved for appellate review, because Willis has failed to show, nor is it apparent to us, that it was ruled on in the trial court. See Butts, 273 Ga. at 771 (31); Hill, 277 Ga. at 269 (VI) (A). Furthermore, the claim is meritless in any case. See Stinski v. State, 286 Ga. 839, 846 (26) (691 SE2d 854) (2010) (holding that the trial court did not err by asking the statutory questions, "allowing follow-up questions by both parties, and then excusing jurors in accordance with constitutional standards").

6. The trial court did not err by denying Willis's motion claiming that OCGA § 17-10-1.2, Georgia's statute authorizing victim impact testimony in death penalty trials, was unconstitutional on its face. See Lance, 275 Ga. at 24 (27). To the extent that Willis further challenges the constitutionality of this statute on the ground that it provides that the failure to comply with the procedural requirements set forth in it should not serve as the basis for invalidating a criminal sentence, the claim has not been preserved for appellate review, because Willis has failed to show, nor is it apparent to us,

that this particular argument was raised and ruled on in the trial court. See

OCGA § 17-10-1.2 (d) ("No sentence shall be invalidated because of failure

to comply with the provisions of this Code section. . . ."). See also Butts, 273

Ga. at 771 (31); Hill, 277 Ga. at 269 (VI) (A).

7.  Willis makes multiple arguments attempting to show that the trial

court erred by denying his challenge to the manner in which the lists were

assembled from which prospective jurors were summoned for his grand jury

and traverse jury.  Each of these arguments was either properly rejected by

the trial court or was not preserved for review on appeal.

(a)  Prior to the adoption of the Jury Composition Rule effective on

July 1, 2012, which was after Willis's indictment and trial, "each county

utilized so-called 'forced balancing' in an attempt to make its jury lists

include men and women and certain identifiable racial groups in proportion

to the county's population as determined by the most recent decennial

census."  Ricks v. State, 301 Ga. 171, 173 (1) (800 SE2d 307) (2017).  The

trial court did not err by rejecting Willis's claim that such forced balancing

was unconstitutional.  See Williams v. State, 287 Ga. 735, 735-736 (699

SE2d 25) (2010), superseded by the Jury Composition Reform Act of 2011 as

noted in Ellington v. State, 292 Ga. 109, 118 n.2 (735 SE2d 736) (2012).

(b) Willis argues that the varying "no-show" rates of summoned jurors in Fulton County result in an unconstitutional underrepresentation of certain groups. The trial court noted that Willis's argument was "unsupported" by any evidence, and Willis has not directed this Court's attention to, nor has this Court readily identified, any such evidence in the record. See Hill, 277 Ga. at 269 (VI) (A) (holding appellate claims lacking specific argument to be "abandoned").

(c) Willis argues that the trial court erred by rejecting his claim alleging that Fulton County failed to incorporate both voter registration and driver services records in its jury lists as required by the former version of OCGA § 15-12-40. However, this Court's review of the record supports the trial court's factual finding that Fulton County used both sources in creating its lists, and Willis has not directed this Court to any evidence to the contrary. See Hill, 277 Ga. at 269 (VI) (A).

(d) Willis argues that "the court administrators and jury clerks involved violated or ignored a number of the statutory and court-ordered requirements for the selection of petit and grand jurors" in his case. He provides only one specific example, which involves the length of time for which jurors were exempted from being summoned after serving. In making

this claim, Willis purports to be quoting from a motion that he filed in the trial court, but he provides no citation to the record for the motion, and we have not readily identified its location. Furthermore, Willis provides no citation to any evidence in the record to support the claim. Finally, the only trial court order or ruling for which Willis provides a citation does not address the one specific allegation raised here. Under these circumstances, we conclude that Willis has failed to provide adequate argument and citation on appeal for this Court to conclude that the trial court ruled on this matter and that it erred. See Butts, 273 Ga. at 771 (31); Hill, 277 Ga. at 269 (VI) (A).

(e) Willis argues that the trial court erred by denying his claim that certain demographic groups were underrepresented on the lists from which his grand jurors and traverse jurors were summoned. Because the only order or ruling that he cites specifically withheld ruling on this claim, we conclude that he has failed to provide adequate argument and citation on appeal for this Court to conclude that the trial court ruled on this matter and that it erred. See Butts, 273 Ga. at 771 (31); Hill, 277 Ga. at 269 (VI) (A).

8. Willis argues that the trial court erred by not granting a continuance to allow him to further pursue information related to counseling that the three

surviving child victims had received. In a motion to compel the State to assist the defense in obtaining this information, Willis stated that he had learned about the counseling from the State on April 21, 2008, and that "the State first became aware [of the counseling] only days earlier when [the State] met with a family member of the Hankin[s] sisters." On May 12, 2008, Willis filed three motions, each seeking to compel the State to produce information about the counseling of one of the three surviving child victims. We note that these motions clearly reveal that Willis had already obtained much of the information relevant to this claim. An ex parte hearing was held on May 15, 2008, and the trial court provisionally denied the motion for a continuance, stating:

> So at this time, the motion for a continuance is denied. That is not to say that if you have records that do have some bearing, that do require something, I would not be prepared to consider delaying the ultimate swearing of the jury. But I see no reason given where we are not to proceed with jury selection because we are not at a point where I've heard anything to indicate that an immediate cessation of proceedings is required.

Voir dire in Willis's case began on May 28, 2008. In an ex parte hearing held on June 23, 2008, the trial court again denied Willis's motion for a continuance, citing a lack of sufficient reason at that time to grant the motion, while a hearing was being held that same morning in Mississippi regarding

possible additional information about counseling provided to the surviving child victims. On June 24, 2008, defense counsel informed the trial court that it was working with a Mississippi judge to have any records that were available in Mississippi by subpoena turned over to the trial court for its in camera review, and it appears that such records were received by the trial court no later than June 30, 2008, because they were placed under seal by the trial court on that date. On June 25, 2008, the trial court questioned the grandmother and guardian of the surviving child victims in camera regarding the counseling that the children had received. After the trial court reported to defense counsel the results of this questioning and stated that it had "ended [its] inquiry with respect to this matter," defense counsel stated, "We understand." The guilt/innocence phase began on June 26, 2008. On July 1, 2008, the trial court announced at an ex parte hearing that it had received additional records from a healthcare provider in Atlanta, Georgia, had reviewed the records, and had found nothing in them relevant to the issues to be tried. The sentencing phase began on July 10, 2008.

Under the circumstances described above, which included an ongoing back and forth between defense counsel and the trial court as possible relevant information was investigated and obtained where available, we

conclude that Willis has failed to show that the trial court abused its discretion in denying Willis's motion for a continuance. See Rice, 292 Ga. at 203-204 (6).

Jury Selection Issues

9. Willis argues that the trial court erred by excusing several prospective jurors based on their opposition to imposing a death sentence. This Court has explained the applicable standard of review on appeal as follows:

> [T]he proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. This standard does not require that a juror's bias be proved with unmistakable clarity. Instead, the relevant inquiry on appeal is whether the trial court's finding that a prospective juror is disqualified is supported by the record as a whole. An appellate court . . . must pay deference to the trial court's determination. This deference encompasses the trial court's resolution of any equivocations and conflicts in the prospective jurors' responses on voir dire. Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion. The same standard applies to a court's decision to qualify a prospective juror over defendant's objection.

Humphreys v. State, 287 Ga. 63, 71-72 (5) (694 SE2d 316) (2010) (citations and punctuation omitted). As the Supreme Court of the United States has

held, the erroneous exclusion from the list from which a defendant's jury is selected of a single prospective juror based on his or her purported unwillingness to consider a death sentence mandates the reversal of a death sentence. See Gray v. Mississippi, 481 U. S. 648, 661-667 (III) (A), (B) (1) (107 SCt 2045, 95 LE2d 622) (1987) (declining to adopt a harmless error analysis). As set forth below, however, we find no abuse of discretion in the trial court's excusing the prospective jurors at issue here.

(a) Under questioning by the trial court, prospective juror Crawford stated that the death penalty was something that he did not believe in, that he did not know how he would feel about a death sentence even if his own family member were murdered, and that he has been opposed to the death penalty for "at least 15 years." Although he stated at one point that he could conceive of a circumstance wherein he might consider a death sentence, he later stated as follows about whether he would be open to considering it: "No, I would argue against it. I know I would. So, no." When questioned by the State, he stated: "I guess this is the first time I've had to actually sit and make a stand in this issue, and I really don't think I could, you know, put someone to death. I don't think I could." When asked if there were any circumstance where he could see himself considering a death sentence, he

answered, "Not in a courtroom." During questioning by the defense, he stated: "Well, I guess you're asking the same question several different times and several different ways, but, no, I — you know, I don't think I could put anyone to death, I guess is the same answer." Under further questioning by the State, he stated: "So I guess my opinion could be changed, but I do not feel that way now." He added: "Well, as I said in the beginning, if it were my own family, my opinion may change. But other than that, no." Finally, he stated: "I would still feel responsible for it. And that's something I think would weigh on my conscience and not allow me to take someone else's life." Viewed as a whole, we conclude that the trial court did not abuse its discretion by excusing this juror.

(b) Under her initial questioning by the trial court, prospective juror Anderson stated that she had never previously given thought to whether she could consider a death sentence for someone she had found guilty of murder. She then stated that she could see herself in a circumstance in which she would do so, that she "could do whatever [she] would have to do," and that, to the extent that she had just given the matter thought, she could consider all three sentencing options. Under questioning by the defense, she indicated again that she had never previously given much thought to the question of the

death penalty. In later questioning by the defense, she stated: "I think ultimately, it's just an act of having will over someone's life, and I don't see myself as a person with authority." She then stated: "If it was somebody else's decision, I would be — and whatever, they were found guilty and they deserved it, I would be okay because it wasn't mine and I wouldn't have to die knowing — you know what I'm saying?" She responded to further questions from the trial court by stating that she "was going to have to say no" regarding whether she would be able to consider a death sentence and that she could not conceive of a circumstance where she personally would be prepared to consider a death sentence. She then added, "I don't want to die with that on my conscience." Considering her voir dire as a whole, especially her final responses to the trial court's questions seeking her final thoughts after being questioned, we conclude that the trial court did not abuse its discretion by excusing her. See Spivey v. State, 253 Ga. 187, 197 (6) (d) n.3 (319 SE2d 420) (1984) ("The fact that a juror may arrive at a posture which varies from his initial expressions should be understood as exactly what it is — a final distillation, after substantial questioning by contending counsel and often by the judge, of theretofore unarticulated, amorphous, and casual thoughts on capital punishment.").

(c)  Under questioning by the trial court, prospective juror Lewis gave the following as his opinion on the death penalty:  "Basically, I would — I sort of think that life is something to be cherished, and, you know, we don't have the right to take anyone's life from that standpoint."  He stated that he had held this view for "[p]retty much all of [his] life" and that the view was now possibly religious in nature but was "just the way [that he] felt" while growing up.  When asked if he could conceive of a circumstance in which he could consider a death sentence, he stated:  "I would say possibly, but — yeah.  Yeah."  He later responded to the same question by stating, "Possibly." He indicated that he was leaning toward one sentencing option and, when asked if his leaning would preclude his consideration of the other two sentencing options, he stated:  "Possibly I would not be able to."  He answered a similar question, "Probably so."  Finally, he answered affirmatively when asked if it were true that he was "really . . . not open" to hearing evidence that "might let [him] consider" the death penalty.  Under questioning by the State, he stated that he was "[g]enerally" against the death penalty.  He added:  "[L]ike I said earlier, that life is precious.  We don't have the right to take nobody's life or — you know, or try to take someone else's life, meaning as a juror type thing or as an individual."  He stated that

his upbringing and background "probably" would prevent him from considering a death sentence, adding, "Well, you never say never, but generally speaking I would say no." When asked again at the end of his voir dire if he would be able to consider a death sentence, he stated: "Possibly, yes. It's vague, but that's the way it is." He added, "Probably could consider it, yes." Considering his voir dire as a whole, we conclude that the trial court did not abuse its discretion in excusing this juror. See Humphreys, 287 Ga. at 72 (5) ("A review of the record shows that the responses of [the jurors in question] regarding their ability to impose a death sentence were equivocal and contradictory. The trial court was authorized to find from the totality of their responses that they could not meaningfully consider all three sentencing options. . . .").

10. Willis argues that the trial court erred by excusing for cause two prospective jurors for reasons not related to their death penalty views. We conclude that any error was harmless and therefore does not warrant reversal.

(a) Willis argues that the trial court erred by excusing for cause prospective juror McDonald based on his association with one of Willis's trial attorneys as co-members of the Prince Hall Masonic Lodge and his stated inclination to give more weight to statements from Willis's trial

attorney than to those of other persons. We have held that "'a defendant has no vested interest in a particular juror but rather is entitled only to a legal and impartial jury'" and, therefore, that the erroneous dismissal for cause of a prospective juror for a reason that is not "constitutionally impermissible," like the reason here based on possible personal bias, does not require reversal on appeal. Coleman, 286 Ga. at 296 (5) (quoting Perry v. State, 264 Ga. 524, 525 (2) (448 SE2d 444) (1994)). Thus, pretermitting whether the trial court abused its discretion in excusing this prospective juror, we conclude that Willis's claim must fail. See Whatley v. State, 270 Ga. 296, 298 (2) (509 SE2d 45) (1998) (noting that a juror should be disqualified if he or she cannot set aside a prior opinion and decide the case based on the evidence and the trial court's charge and noting the trial court's discretion in deciding this matter).

(b) When the State made a motion to excuse prospective juror Turner based on the alleged fact that she did not "understand[ ] all three of the sentencing options well," the trial court excused the juror on the independent basis of her general inability to understand what was said in court. Pretermitting whether the trial court abused its discretion in this ruling, Willis is not entitled to relief on appeal, because the erroneous dismissal for cause

of a prospective juror for a reason that is not "constitutionally impermissible," like the reason here based on the juror's inability to understand the proceedings, does not require reversal on appeal. Coleman, 286 Ga. at 296 (5).

11. As set forth more fully above, "the proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," and the decision "[w]hether to strike a juror for cause is within the discretion of the trial court." Humphreys, 287 Ga. at 71-72 (5) (citations and punctuation omitted). Willis argues that the trial court erred by refusing to excuse two jurors based on their death penalty views, neither of whom served on his twelve-person jury. However, as set forth in more detail below, we overrule our previous holdings to the contrary and hold now that it is harmless error where a defendant's motion to excuse a prospective juror is erroneously denied but the juror is subsequently removed from the defendant's twelve-person jury by his or her use of a peremptory

strike.[2]  Applying this new holding below, we conclude that Willis was not harmed by any error that the trial court might have committed in refusing to excuse the two prospective jurors at issue here, because those jurors never served on Willis's twelve-person jury.

(a)  This Court has previously held that "causing a defendant to unnecessarily use a peremptory strike on a juror that should have been excused for cause is per se harmful error." Fortson v. State, 277 Ga. 164, 166 (2) (587 SE2d 39) (2003).  In reaching this holding in Fortson, this Court relied first on Bradham v. State, a case that adopted no such per se rule but that instead recognized the following:

> As late as 1978 this court stated, "Thus, if a challenge is made and improperly overruled by the court, but the juror so challenged for cause does not serve because subsequently struck by the complaining party, such ruling by the court is not error unless it appears that the party had to exhaust his peremptory challenges in order to strike that juror."

Bradham v. State, 243 Ga. 638, 639 (3) (256 SE2d 331) (1979) (emphasis supplied) (quoting Foster v. State, 240 Ga. 858, 859 (2) (242 SE2d 600) (1978)).  The Court in Fortson further relied on Kirkland v. State, a case that also acknowledged this Court's presumption of harmlessness where the

---

[2]  As we have held previously, such an error is also harmless "where the State exercises a peremptory strike to remove the juror." Nwakanma v. State, 296 Ga. 493, 500 (5) (768 SE2d 503) (2015) (emphasis supplied).

defense used a peremptory strike to remove a prospective juror whom the trial court had refused to remove for cause and where the defendant had not subsequently used all of his or her remaining peremptory strikes. See Kirkland v. State, 274 Ga. 778, 779 (2) (560 SE2d 6) (2002) ("'When a defendant in a felony trial has to exhaust his peremptory strikes to excuse a juror who should have been excused for cause the error is harmful.'" (quoting Bradham, 243 Ga. at 639 (3)). But Kirkland also relied on this Court's reasoning in Harris v. State, 255 Ga. 464, 465 (2) (339 SE2d 712) (1986), including its construction of OCGA § 15-12-160 (now OCGA § 15-12-160.1), to accept the seemingly-unqualified notion that "an accused is entitled to a full panel of qualified jurors (that is, jurors not subject to being excused for cause) to which to direct his peremptory strikes." Kirkland, 274 Ga. at 779-780 (2) (citation and punctuation omitted; emphasis in original). Thus, it appears that this Court's holding in Fortson that "causing a defendant to unnecessarily use a peremptory strike on a juror that should have been excused for cause is per se harmful error," Fortson, 277 Ga. at 166 (2), depends on Harris.

In Harris, this Court held as follows:

> The defendant's use of his peremptory strikes will . . . no longer play a role in our evaluation of the harm caused by the refusal to strike an unqualified juror. <u>A defendant is entitled to a panel of forty-two qualified jurors.</u>  OCGA § 15-12-160 [now OCGA § 15-12-160.1].  . . .  The defendant's failure to exhaust his peremptory strikes before the twelfth juror was impaneled does not render the error harmless.

<u>Harris</u>, 255 Ga. at 465 (2) (emphasis supplied).  Through this holding, the Court, with no stare decisis analysis, abandoned our prior case law presuming the <u>absence</u> of harm where a prospective juror was unsuccessfully challenged for cause by the defense, the juror was removed by the defense through a peremptory strike, and the defendant did not exhaust all of his or her peremptory strikes.  See <u>Foster</u>, 240 Ga. at 859 (2).  <u>Harris</u> cited the special concurrences of a single Justice that had identified the difficulty in determining on appeal how the parties have chosen to exercise or decline to exercise their allotted peremptory strikes and citing as <u>statutory</u> authority the following:

> When any person stands indicted for a felony, the court shall have impaneled 30 jurors from which the defense and prosecution may strike jurors; provided, however, in any case in which the state announces its intention to seek the death penalty, the court shall have <u>impaneled 42 jurors</u> from which the defense and state may strike jurors.  If, for any reason, after striking from the panel there remain less than <u>12 qualified jurors</u> to try the case, the presiding judge shall summon such numbers of persons who are competent jurors as may be necessary to provide a full panel.

> In making up the panel or successive panels, the presiding judge shall draw the tales jurors from the jury box of the county and shall order the sheriff to summon them.

OCGA § 15-12-160 (as in effect in 1986 and now appearing in substantially the same form in OCGA § 15-12-160.1) (emphasis supplied). See Harris, 255 Ga. at 465 (2) (citing Blankenship v. State, 247 Ga. 590, 597 (277 SE2d 505) (1981) (Gregory, J., concurring specially), Wilcox v. State, 250 Ga. 745, 759 (301 SE2d 251) (1983) (Gregory, J., concurring specially), and OCGA § 15-12-160 (now OCGA § 15-12-160.1)).

In assessing the correctness of our holding in Harris and, in turn, our holding in Fortson, we first follow the reasoning of the United States Supreme Court in concluding that there is no basis under the Constitution of the United States for those holdings. The Supreme Court has clearly held that "'peremptory challenges [to prospective jurors] are not of constitutional dimension'" but instead "are one means to achieve the constitutionally required end of an impartial jury." United States v. Martinez-Salazar, 528 U. S. 304, 307 (120 SCt 774, 145 LE2d 792) (2000) (quoting Ross v. Oklahoma, 487 U. S. 81, 88 (108 SCt 2273, 101 LE2d 80) (1988)). Finding the Supreme Court's reasoning persuasive, this case presents us with no reason to arrive at a different conclusion under the Georgia Constitution.

As to the statutory basis for this Court's holding in <u>Harris</u> and in turn in <u>Fortson</u>, we note that the plain meaning of the statute cited for the holding in <u>Harris</u> was never properly addressed and indeed the statute was not even quoted. Contrary to the assertion in <u>Harris</u>, this statute never requires that the "42 jurors from which the defense and state may strike jurors" be without defects in their qualifications and that any such defects are presumptively harmful. OCGA § 15-12-160 (now OCGA § 15-12-160.1). Instead, this statute's only reference to "qualified jurors" is to the jurors who will "try the case." Id. Thus, we conclude that <u>Harris</u> incorrectly relied on this statute as a basis for its holding.

The only other arguable statutory basis for the presumption of harm in <u>Harris</u> that we can discern is the fact that peremptory strikes are granted to defendants by statute, see OCGA § 15-12-165, and therefore should not be taken away. However, we agree with the reasoning of the United States Supreme Court in applying the Federal Rules of Criminal Procedure to a case where a defendant used one of his limited peremptory strikes to remove a juror whom he had unsuccessfully moved to have excused for cause:

> In choosing to remove Gilbert rather than taking his chances on appeal, Martinez-Salazar did not lose a peremptory challenge. Rather, he used the challenge in line with a principal

reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury.

Martinez-Salazar, 528 U. S. at 316 (III). The Supreme Court thus held:

> We reject the Government's contention that under federal law, a defendant is obliged to use a peremptory challenge to cure the judge's error. We hold, however, that if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right.

Id. at 307. Following this same reasoning, we agree with the following from the dissent in Fortson:

> [T]he mere exhaustion or waste of peremptory strikes should not dictate that a given action regarding a disqualified juror is either invariably harmless or necessarily harmful. Instead, the focus under current Georgia law should be on whether any unqualified juror was seated as the ultimate result of errors with respect to jurors challenged for cause.

Fortson, 277 Ga. at 170 (Carley, J., dissenting, joined by Sears, P. J.) (emphasis supplied).

We must also consider the principle of stare decisis in determining the continued viability of the holdings of Harris and Fortson. This Court has stated:

> Under the doctrine of stare decisis, courts generally stand by their prior decisions, because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual

and perceived integrity of the judicial process. Stare decisis, however, is not an inexorable command. . . . In reconsidering our prior decisions, we must balance the importance of having the question <u>decided</u> against the importance of having it <u>decided</u> <u>right</u>. To that end, we have developed a test that considers the age of precedent, the reliance interests at stake, the workability of the decision, and, most importantly, the soundness of its reasoning.

<u>Olevik v. State</u>, 302 Ga. 228, 244-245 (2) (c) (iv) (806 SE2d 505) (2017) (citations and punctuation omitted; emphasis in original).

Applying this analysis, we "most importantly" conclude that a new holding would be much more sound in its reasoning, in light of our discussion above showing that there is no valid constitutional or statutory basis for this Court's holding in <u>Harris</u> and in light of our current understanding of the fundamental purpose of peremptory strikes. Moreover, the holdings in <u>Harris</u> from 1986 and <u>Fortson</u> from 2003 "are neither ancient nor entrenched" in Georgia law, <u>Sosniak v. State</u>, 292 Ga. 35, 49 (734 SE2d 362) (2012) (Nahmias, J., concurring), and indeed <u>Harris</u> and <u>Fortson</u> themselves departed from a long history of a different approach "without engaging in any analysis of stare decisis," <u>Woodard v. State</u>, 296 Ga. 803, 812 (3) (b) (771 SE2d 362) (2015). See <u>Southall v. State</u>, 300 Ga. 462, 468 (1) (796 SE2d 261) (2017) (overruling a 44-year-old precedent). As to the reliance issues potentially at stake, we note that the holdings in <u>Harris</u> and

Fortson are procedural in nature and "establish[ ] no substantive rights."

State v. Jackson, 287 Ga. 646, 658 (5) (697 SE2d 757) (2010). Furthermore,

this Court has relied on the presumed harm holdings to reverse convictions in

only two cases, with the last one decided more than 25 years ago. See Lively

v. State, 262 Ga. 510, 512 (2) (421 SE2d 528) (1992); Beam v. State, 260 Ga.

784, 785 (2) n.3 (400 SE2d 327) (1991). [3] See also Ga. Dept. of Natural

---

[3] In light of our holding in this case, Lively and Beam are overruled. In many other cases, this Court has referred to the relevant holdings in Harris and Fortson, and those cases are disapproved to that extent. See Caldwell v. State, 304 Ga. 51, 54 (2) (816 SE2d 13) (2018); Gray v. State, 298 Ga. 885, 887 (2) n.3 (785 SE2d 517) (2016); Martin v. State, 298 Ga. 259, 273 (4) (779 SE2d 342) (2015); Spears v. State, 296 Ga. 598, 608 (7) (769 SE2d 337) (2015); Nwakanma v. State, 296 Ga. 493, 500 (5) (768 SE2d 503) (2015); Edenfield v. State, 293 Ga. 370, 379 (7) (744 SE2d 738) (2013); Ellington v. State, 292 Ga. 109, 140 (8) (b) (735 SE2d 736) (2012); Rice v. State, 292 Ga. 191, 194-195 (3) (733 SE2d 755) (2012); Hargrove v. State, 291 Ga. 879, 881 (2) (a) (734 SE2d 34) (2012); Stolte v. Fagan, 291 Ga. 477, 478-479 (1) (731 SE2d 653) (2012); Ledford v. State, 289 Ga. 70, 77 (7) (709 SE2d 239) (2011); Humphreys v. State, 287 Ga. 63, 71 (4) (694 SE2d 316) (2010); Maxwell v. State, 282 Ga. 22, 26 (2) (d) & n.12 (644 SE2d 822) (2007); Sealey v. State, 277 Ga. 617, 620 (7) (593 SE2d 335) (2004); Wallace v. State, 275 Ga. 879, 881 (3) & n.11 (572 SE2d 579) (2002); Lance v. State, 275 Ga. 11, 15 (8) (560 SE2d 663) (2002); Kirkland v. State, 274 Ga. 778, 779-780 (2) (560 SE2d 6) (2002); Terrell v. State, 271 Ga. 783, 783-784 (1) (523 SE2d 294) (1999); Menefee v. State, 270 Ga. 540, 542 (2) (512 SE2d 275) (1999); Walker v. State, 262 Ga. 694, 696 (2) (424 SE2d 782) (1993); Hayes v. State, 261 Ga. 439, 441 (2) (405 SE2d 660) (1991); Pope v. State, 256 Ga. 195, 202 (7) (e) (345 SE2d 831) (1986).

The following cases from the Court of Appeals are also overruled or disapproved to the extent that they relied on or referred to the holdings in Harris and Fortson: Coffee v. State, 347 Ga. App. 443, 443 (1) (820 SE2d 79) (2018); DeSantos v. State, 345 Ga. App. 545, 549 (1) & n.3 (813 SE2d 782) (2018); Budhani v. State, 345 Ga. App. 34, 40 (2) n.6 (812 SE2d 105) (2018); Scarpaci v. Kaufman, 328 Ga. App. 446, 446 (762 SE2d 172) (2014); Wheeler v. State, 327 Ga. App. 313, 316 (1) n.6 (758 SE2d 840) (2014); Futch v. State, 326 Ga. App. 394, 398 (1) (c) (756 SE2d 629) (2014); Carter v. State, 326 Ga. App. 144, 149 (4) (756 SE2d 232) (2014); Stolte v. Fagan, 322 Ga. App. 775, 775 (746 SE2d 255) (2013); Bates v. State, 322 Ga. App. 319, 323 (3) n.3 (744 SE2d 841) (2013); Ham v. State, 303 Ga. App. 232, 240 (2) (a) n.23 (692 SE2d 828) (2010); Berry v. State, 302 Ga. App. 31, 33 (1) n.2 (690 SE2d 428) (2010); Underwood v. State, 283 Ga. App. 638, 639 (1) n.9 (642 SE2d 324) (2007); Souder v. State, 281 Ga. App. 339, 345 (3) n.4 (636 SE2d 68) (2006); Moses v. State, 265 Ga. App. 203, 207 (2) (a) (593 SE2d 372) (2004); Kier v. State, 263 Ga. App. 347, 350 (1) (587 SE2d 841) (2003); Bennett v. Mullally, 263 Ga. App. 215, 217 (1) (587 SE2d 385) (2003); Park v. State, 260 Ga. App. 879, 882 (1) (581 SE2d 393) (2003); Foster v. State, 258 Ga. App. 601, 609 (3) n.28 (574 SE2d 843) (2002); Ivey v. State, 258 Ga. App. 587, 593 (2) & n.15, 594 (574 SE2d 663) (2002); Cannon v. State, 250 Ga. App. 777, 781 (1) & n.2 (552 SE2d 922) (2001); Davis v. State, 236 Ga. App. 32, 35 (5) (510 SE2d 889) (1999); Scruggs v. State, 227 Ga. App. 35, 35 (1) n.1 (488 SE2d 110) (1997); Thompson v. State, 212 Ga. App. 175, 175 (1) (442 SE2d 771) (1994); Lowman v. State, 197 Ga. App. 556, 557 (2) (398 SE2d 832) (1990); Howard v. State, 191 Ga. App. 418, 418-419 (2) (382 SE2d 159) (1989); Day v. State, 188 Ga. App. 648, 649 (4) (374 SE2d 87) (1988); Bass v. State, 183 Ga. App. 349, 352-353 (358 SE2d 837) (1987); Parisie v. State, 178 Ga. App. 857, 859 (2) (344 SE2d 727) (1986).

Resources v. Center for a Sustainable Coast, 294 Ga. 593, 601-602 (755 SE2d 184) (2014) (explaining that "[t]he reliance on" a prior precedent was "limited" where "our research ha[d] uncovered only four published cases that ha[d] applied its holding"). The new holding that we are considering is also highly workable, because it focuses on the simple question of whether the allegedly unqualified juror served on the defendant's twelve-person jury. Indeed, not adopting a new holding would result in the occasional but enormous cost of retrying some defendants "'in cases where the trial was nearly perfect and the verdict is unquestionably sound.'" Fortson, 277 Ga. at 171 (Carley, J., dissenting, joined by Sears, P. J.) (quoting State v. Lindell, 629 NW2d 223, 249 (V) (D) (Wis. 2001)).

Based on all of these considerations, we overrule Harris, 255 Ga. 464, and Fortson, 277 Ga. 164, and we hold that a defendant is not presumptively harmed by a trial court's erroneous failure to excuse a prospective juror for cause simply because the defendant subsequently elected to remove that juror through the use of a peremptory strike. Instead, such a defendant must show on appeal that one of the challenged jurors who served on his or her twelve-person jury was unqualified.[4]

---

[4]

In reaching this conclusion, we need not address the related question of whether the trial

(b)   Willis used one of his peremptory strikes to remove prospective juror Johnson from the panel from which his twelve-person jury was chosen. Thus, in light of the discussion above, any error in the trial court's finding the juror qualified to serve based on his death penalty views was harmless.

(c)   Prospective juror Skiles appeared on the list of names from which alternate jurors might have been selected, and we note that an alternate juror actually served on Willis's final twelve-person jury.   Compare Heidler v. State, 273 Ga. 54, 57 (3) (c) (537 SE2d 44) (2000) (addressing alleged defects in the qualifying of potential jurors who appeared after the list of 42 names from which the defendant's twelve-person jury was selected in a case where no alternate jurors participated in deliberations).   However, in light of the discussion above, any error in qualifying this juror based on his death penalty views was harmless, because, based on his placement on the list of potential jurors and the parties' combined use and lack of use of their peremptory strikes, he never served as a member of Willis's twelve-person jury.

---

court's error in denying a motion to excuse a particular juror for cause is harmless, despite the fact that the juror served on the defendant's twelve-person jury, where the defendant did not exhaust his or her peremptory strikes.

12. Willis argues that the trial court erred by limiting his voir dire of certain jurors. Noting that "[t]he scope of jury voir dire is largely left to the trial court's sound discretion" and upon our review of the entire voir dire, we find no reversible error. Riley v. State, 278 Ga. 677, 685 (6) (A) (604 SE2d 488) (2004).

As we held in Division 11 above, the trial court's erroneous failure to excuse a prospective juror for cause, as shown by that juror's voir dire responses, cannot serve as the basis for reversal on appeal unless that juror served on the defendant's twelve-person jury. By necessary extension of that holding, we also hold that the trial court's erroneous refusal to allow a defendant to ask a particular voir dire question to a particular juror cannot serve as the basis for reversal on appeal, even if a hypothesized response to the forbidden question might have shown the juror to be unqualified, unless that juror served on the defendant's twelve-person jury. Accordingly, we need not address the following prospective jurors who did not serve on Willis's twelve-person jury: Wills, Bray, Moore, Bowens, Johnson, and Adams.

However, in light of the fact that we have pretermitted in Division 11 "the related question of whether the trial court's error in denying a motion to

excuse a particular juror for cause is harmless, <u>despite</u> the fact that the juror served on the defendant's twelve-person jury, where the defendant did not exhaust his or her peremptory strikes," supra, p. 707 n.4, and in light of the complicating fact that Willis failed to exhaust three of his peremptory strikes but challenges in this claim the voir dire limitations of six remaining jurors, we pretermit that same question here and examine the six jurors' voir dire below.

(a) Willis argues that the trial court erred by disallowing a question to juror Gable during the second portion of her voir dire regarding the impact that the juror's religion, philosophy, and life experiences would have on her ability to consider all three sentencing options. As the State correctly noted in its objection, general questions regarding the jurors' views on the death penalty had been allowed during the first portion of each juror's voir dire under a plan for voir dire that the trial court had announced at the beginning of voir dire in the case. The trial court did not abuse its discretion in not allowing this topic to be revisited.

The trial court also did not err in disallowing a question to juror Gable regarding the impact that Willis's status as a convicted felon would have on her consideration of the three sentencing options. In sustaining the State's

objection to this question, which also occurred during the third portion of the juror's voir dire after voir dire on her general death penalty views had already been completed, the trial court focused on the distinction between properly probing sources of potential juror bias that might prevent the juror's consideration of each of the three sentencing options versus improperly seeking to have the juror prejudge how she would specifically weigh certain facts in considering those sentencing options. In our view, the trial court did not abuse its discretion in making this distinction in this way. See Ellington, 292 Ga. at 127 (7) (b) ("The line between permissible inquiry into 'prejudice' (a juror's fixed opinion that a certain result should automatically follow from some fact, regardless of other facts or legal instructions) and impermissible questions of 'pre-judgment' (speculation about or commitment to the appropriate result based on hypothesized facts) can be hazy."); OCGA § 15-12-133 (authorizing voir dire regarding "any fact or circumstance indicating any inclination, leaning, or bias which the prospective juror might have respecting the subject matter of the action").

(b) Juror Jeanne stated that she had not seen any "cases" that had made her feel one way or the other about the death penalty but that it was possible that she had seen "something on T.V., like a program or something" that

caused such feelings. We find no abuse of the trial court's discretion in sustaining the State's objection when the defense attempted to ask a follow-up question about television programs. The trial court permitted adequate voir dire on the issue of the juror's death penalty views without the need for questioning on this tangential topic.

Juror Jeanne responded to questions from both the defense and the trial court and clearly indicated that she would listen to all of the evidence, that she would consider all three sentencing options, and that her sentencing verdict "would depend on the circumstances of what happened." The trial court did not abuse its discretion by interrupting a follow-up question by the defense to state: "Ask her something else. She answered that question."

The trial court did not err by refusing to allow the defense to ask juror Jeanne questions about how she would or would not consider as mitigating certain specific categories of mitigating evidence. See King v. State, 273 Ga. 258, 271 (26) (539 SE2d 783) (2000) ("The trial court did not err by sustaining the State's objections to King's apparent effort to have jurors . . . enumerate the mitigating circumstances they would give weight to.").

After being asked by the defense about the issue of mitigating evidence, juror Jeanne stated: "[T]he death penalty is the law, but you also

have — I don't know how to say this. I think a juror would also have the responsibility of not only looking at have you met that law for the death penalty, but also, the effects of that law." We find no abuse of the trial court's discretion in preventing the defense from asking the follow-up question: "Would it matter to you the effect that it would have on the defendant?" In any case, any error would have been harmless, because the defense pursued the matter and the juror made clear that "all of it applies to the defendant at that point" and that she would consider all of the mitigating and aggravating evidence.

(c) It was not improper for the trial court to sustain an objection when the defense attempted to ask juror Rodriguez a question about mercy that cited specific hypothetical evidence, to later insist that the juror only discuss the issue of mercy "[i]n general," and then to require the defense to move on to another topic once the juror had stated, "I think that [mercy] should be considered." See <u>Rice</u>, 292 Ga. at 196 (3) (d) (discussing "mercy" as addressed during voir dire); <u>Ellington</u>, 292 Ga. at 139-140 (8) (a) (same).

(d) The trial court did not err by refusing to allow questions to juror Edwards about the juror's views regarding a plea bargain reached in an

unrelated murder case because the matter did not have "some impact on this case."

(e)   We find no abuse of discretion in the trial court's urging the defense during the voir dire of prospective juror Fisher to "[a]sk a question" when defense counsel began a question in a somewhat rambling fashion.

13.   Willis argues that the trial court erred by refusing to allow voir dire questions about the jurors' ability to consider each of the sentencing options in a case involving the murder of a child.  As the State concedes, this Court has held that the wholesale disallowance of properly formed questions on the "critical fact" of the murder victim's being a young child is reversible error. See Ellington, 292 Ga. at 135-137 (7) (e).   See also id. at 138 (7) (f) ("[Ellington's] death sentences for the murders of his two children were directly affected by the trial court's error and must therefore be reversed."). The State argues, however, that the issue has not been preserved for appeal and concerns only potential jurors who, for various reasons, never served on the twelve-person jury.  We disagree, because our review of the entire voir dire confirms Willis's contention that throughout voir dire he continually sought to ask questions of the sort he discusses on appeal and confirms that the trial court's directions to the defense regarding the jurors discussed on

appeal would have been understood by the trial court and the parties as applying throughout voir dire. Nevertheless, our review of the entire voir dire indicates that the trial court did not err, because it allowed questions seeking to learn if the jurors would be able to consider all three sentencing options while disallowing additional questions seeking to have the jurors prejudge the case by having them specify what particular weight they would give to the facts that one of the murder victims was a child and the surviving victims were children, repetitive questions, and questions asked outside the portions of voir dire designated by the trial court for such inquiries. See id. at 136 (7) (e) ("[V]oir dire questions must be framed properly to reveal the prospective juror's general view on the critical fact and whether that view is so strong that it would substantially impair the juror in considering all three sentencing options; the questions must not seek to commit the juror to voting a certain way based on that fact."). The summary below of each of the potential jurors discussed specifically on appeal supports our conclusion.

(a) During the defense's initial voir dire of juror Seltzer, the trial court initially sustained the State's objection to the following question: "Do you believe that if a child is killed, that the only appropriate sentence, if you found him guilty of the killing of a child, that the only appropriate sentence

in that case is a death sentence in the killing of a child?" However, any error was immediately rendered harmless when the defense was permitted to ask the juror if he would "consider any other sentence other than death in the killing of a child" and the juror responded, "I think I can." The juror then reinforced his response by indicating that he had no "reservation" about the matter. The trial court did not err by later forbidding sua sponte a question seeking to learn the specific weight that the juror would give to the fact that the murder victim was a child. See Ellington, 292 Ga. at 136 (7) (e) ("[T]he issue is not whether the prospective juror will consider a critical fact [such as the victim's being a child] to be very important or worthy of great weight.").

(b) During the defense's questioning of prospective juror Wills, the trial court sustained the State's objections to questions that specifically identified the child murder victim's age as being three years. Although the ongoing colloquy between the trial court and defense counsel that ensued is at times unclear or even somewhat contradictory, the trial court's essential guidance appears to have been that defense counsel could refer to any specific facts alleged in the indictment but should otherwise begin her lines of inquiry by asking more general questions. The following instruction to defense counsel is noteworthy in this regard:

You get to ask her about what's in the indictment. You get to ask her whether what's in the indictment precludes her considering the sentencing options. That's not in the indictment. All the indictment says is I killed somebody. Says three people. Doesn't say anything about age. Now, if you want to talk about whether or not the age of the victim precludes you from considering sentencing options, you can do that, too. But you can't ask her to basically prejudge the facts by putting in specific facts, which is what you were doing.

Furthermore, we find it especially noteworthy that defense counsel was later permitted, over the State's objection, to ask the juror: "Is there anything about the death of a child in a homicide case that would preclude you from considering life with the possibility of parole?" In response to this question about the least severe of the three possible sentences for murder, the juror responded: "I still think I would be open-minded. I mean, at this point, I feel that way."

(c) After the trial court ruled improper a vague question from the defense about whether prospective juror Markat would "treat the death of a child differently from the death of an adult in a homicide," the trial court provided the defense with the following guidance:

You get to ask him whether he has opinions about children as victims versus adults as victims; would those opinions cause him to be unable to be fair and impartial. Would those opinions cause him to have any bias or prejudice that would prevent him

from fairly evaluating the evidence that's presented. But not how
do you treat them if it's a kid.

We conclude that this guidance was appropriate, especially when viewed in light of the fact that the defense was then permitted to ask the juror directly, over the State's objection, whether a finding by the juror "that a child was killed" would "prevent or preclude" his consideration of life with the possibility of parole, which is the least severe sentence available for murder. See id.

(d) During questioning by the defense of prospective juror Bray, the trial court sustained without comment an unspecific objection by the State. In light of the defense's lack of objection or effort to seek clarification of the ruling and in light of the voir dire that was previously permitted under similar circumstances, we find no error and no reason to believe that the remainder of the voir dire process was tainted.

(e) The trial court sustained an unspecified objection by the State when the defense attempted to ask prospective juror Armstrong, "[H]ave you decided that you [as a father] know what you will think of the sentence in that case before you've heard anything else?" However, the defense was allowed immediately afterward to ask the juror, "Have you precluded any

sentencing options because of who you are [as a father] if you found someone guilty of that indictment?" The juror answered in the negative and further stated that he had no reservations about considering all three sentencing options. In a later discussion with the trial court between this portion and a later portion of the juror's voir dire, the trial court explained its position as follows: "[W]hat you are entitled to know is if he is foreclosed from considering any of them, which is a different matter from what have you decided." After the trial court admitted that it might have misheard the defense's question to the juror, the defense expressed its agreement and voiced no objections. In a later portion of the juror's voir dire, the defense was permitted to ask the juror if he could consider life with the possibility of parole for "the intentional murder of a child," the least severe of the available sentences, and the juror answered, "yes." Under these circumstances, we find no reversible error and no reason to believe that the voir dire process was tainted.

(f) The trial court sustained the State's objection to the following two-pronged question to prospective juror Anderson:

> Is there anything about the death of a child that's connected with the crime that prevents you or stops you from saying once you hear that, you just can't consider other evidence as it relates

> to sentencing; or in the alternative you treat the death of a child the same way you would treat the death of an adult . . . ?

The second portion of this question improperly sought to discover the specific weight that the juror would give to the fact that one of the victims was a child. See id. Furthermore, the defense was immediately thereafter allowed to ask the following question that was proper in its entirety: "Does a death of a child preclude you, prevent you or stop you from considering all of the sentencing options in this case?" We find no error.

(g) Prospective juror Hudson stated during his questioning by the defense: "I heard something about murdering children. It seems to make me lean one way." The defense was then permitted to ask the following proper question: "Is that something — having him found guilty of that, is that something that would stop you or preclude you, for instance, from considering the option of life with the possibility of parole?" The juror answered, "I can't say that it would stop me but, like I said, I lean one way." We find no abuse of discretion in the trial court's then forbidding sua sponte a follow-up question seeking to have the juror specify in what direction such a leaning would be, because the defense was entitled to ask only questions designed "to reveal the prospective juror's general view on the critical fact

[of a child murder victim] and whether that view [wa]s so strong that it would substantially impair the juror in considering all three sentencing options." Ellington, 292 Ga. at 136 (7) (e). We further find no reversible error in the trial court's later forbidding a repetitive question about the juror's ability to consider all three sentencing options.

14. After the jury and alternates were selected, the trial court, in response to receiving information from the sheriff about several jurors who had reported recent problems that might prevent them from serving as jurors, assembled the jurors and informed them that it would listen to each juror's problem, would investigate any claimed problem, and would jail any juror for the duration of the trial whom it found to be "less than 100 percent truthful." Contrary to Willis's arguments, which rely on case law addressing improper outside influences on jurors, the intimidation of a witness, the improper commenting on the witness's credibility, and the coercion of a deadlocked jury to reach a verdict, we find nothing improper in Willis's case about the trial court's somewhat harsh admonition to the jurors to give truthful answers regarding their newly-disclosed alleged problems with jury service. Accordingly, this claim, which was not raised in the trial court, warrants no relief on appeal under the concept of plain error. See Martin, 298 Ga. at 278-

279 (6) (d) (holding that plain error review is available regarding a death sentence even where no objection has been raised at trial).

15. One prospective juror reported during her voir dire that she had overheard a second prospective juror telling a third prospective juror, possibly within the hearing of others, that the second prospective juror had been visiting someone two doors down from the victims' house and that Willis "was there visiting [the victims], having dinner or something, and something went wrong and the events happened."  At the defense's request, the trial court agreed to question "the first group . . . when they c[a]me in in the first panel" about whether they had heard any juror talking about the case. It appears that the trial court did question future panels on this matter, and Willis has not shown that he raised any objection to how the trial court did so.  Accordingly, we find no error.  See Slaughter v. State, 289 Ga. 790, 791-792 (1) (716 SE2d 180) (2011) (addressing a trial court's resolution of a similar issue).

### Sentencing Phase

16. Willis contends that the trial court erred by refusing to exclude portions of the victim impact testimony presented by the State.  See OCGA § 17-10-1.2 (authorizing victim impact testimony); Livingston v. State, 264 Ga.

402, 404 (1) (c) (444 SE2d 748) (1994) (holding constitutional OCGA § 17-10-1.2 and, thus, the admission of victim impact evidence generally and finding "sufficient safeguards within the statute to ensure" against the admission of evidence relating to constitutionally impermissible factors). A review of the record and trial transcript shows that, in response to receiving the State's proposed victim impact statements of four witnesses, Willis submitted a brief to the trial court objecting in detail to numerous portions of the statements on statutory and state and federal constitutional grounds. Although Willis claims that the trial court made "no formal ruling" on his objections, the trial court, immediately prior to the sentencing phase, gave Willis an opportunity to be heard on the matter, and Willis chose to rely on his brief. Shortly thereafter, the trial court recessed and reviewed the statements that the State had submitted along with Willis's written objections and, upon returning to the courtroom, announced its ruling redacting some but not all of the portions that Willis had objected to in his brief. See Turner v. State, 268 Ga. 213, 214-215 (2) (a) (486 SE2d 839) (1997) (recommending a procedure whereby objections to victim impact statements can be raised prior to trial).

Willis alleges that the trial court erred in allowing unconstitutionally inflammatory testimony from Williams's sister, mother, and father over his objection. Willis contends that the contested testimony was error because it presented a "'detailed narration of . . . emotional and economic sufferings of the victim's family,'" quoting Turner, 268 Ga. at 215 (2) (b) (quoting Livingston, 264 Ga. at 417 (Benham, P. J., dissenting)).[5] However, each witness's statement was brief, consisting of the equivalent of approximately three complete pages or less of trial transcript, and the cited portions describing the family's pain and loss were proper testimony and not unduly inflammatory. See Lawler v. State, 276 Ga. 229, 232 (3) (576 SE2d 841) (2003) (noting the brevity of the testimony presented when finding that it was not improper and explaining that "the testimony to be primarily guarded against in death penalty trials involves the use of arbitrary factors in the decision to impose a death sentence, such as race or religion, and not the emotion caused by the defendant's actions and the ensuing loss"). Although

---

[5] In Turner, this Court held constitutional two victim impact statements, noting among other things that the statements did not provide a "detailed narration of . . . emotional and economic sufferings of the victim's family." Turner, 268 Ga. at 215 (2) (b) (citation and punctuation omitted; emphasis supplied). In using this language, we were by no means suggesting that this type of testimony is entirely foreclosed but were merely cautioning trial courts to use their discretion to avoid its excessive presentation. See McClain v. State, 267 Ga. 378, 387 (10) (b) (477 SE2d 814) (1996) ("[E]ven legal victim impact testimony may be inflammatory if admitted in excess. . . .").

Williams's father's statement that "[w]e are expecting justice" was improper, we find that this single impropriety was harmless beyond a reasonable doubt in light of the overwhelming evidence and the nature of Willis's crimes. See Martin, 298 Ga. at 285 (9) (affirming the defendant's two death sentences after applying plain error review pursuant to OCGA § 17-10-35 (c) (1) to improper victim impact testimony "refer[ring] to the family's desire for 'justice,'" along with other objectionable testimony not objected to at trial); Stinski, 286 Ga. at 854 (55) (same, after applying harmless beyond a reasonable doubt review to "several minor instances" of improper victim impact testimony that was objected to at trial). Cf. Bryant v. State, 288 Ga. 876, 877, 897-898 (15) (a) (708 SE2d 362) (2011) (reversing the defendant's death and life without parole sentences, where the victim impact testimony, particularly the "half-hour testimony" of the victim's sister, violated the "constitutional limits on testimony concerning a witness's characterizations and opinions about the crime and the defendant").

Willis also argues that the trial court erred in allowing certain portions of the testimony of Talisa Hankins's cousin, Angie Hankins. However, Willis raised no objection to this particular testimony in the trial court; thus, this argument was not preserved for ordinary appellate review. See Tollette

v. State, 280 Ga. 100, 105-106 (11) (621 SE2d 742) (2005) (holding that an objection to victim impact evidence not raised in the trial court was waived and citing Earnest v. State, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992)).  In any event, there was no error.  In the contested testimony, Angie Hankins described as "unbearable" some of her personal experiences related to Willis's crimes, which she listed with little elaboration as receiving the telephone call informing her of the shootings, identifying the bodies, being with Q. H. and C. H. at the hospital, explaining to the children that their parents and little brother "[we]re not coming back," making funeral arrangements, and attending the funeral with the children.  While her testimony was a poignant description of how Willis's crimes had affected her, it "neither encourage[d] 'the jury to impose the death penalty based on the victim's class or wealth,' nor crosse[d] 'the line to a highly emotional and inflammatory appeal to the jury's passions and prejudices.'"  Pickren v. State, 269 Ga. 453, 454 (1) (500 SE2d 566) (1998) (quoting Simpkins v. State, 268 Ga. 219, 223 (3) (486 SE2d 833) (1997)).  Therefore, the testimony was not improper.  See Lawler, 276 Ga. at 232 (3) (stating that testimony is not unconstitutional simply because it is poignant or sad).

Finally, Willis argues that "the emotional delivery" of the victim impact testimony of Williams's mother, Frankie Griffin, rendered her testimony unconstitutionally prejudicial and inflammatory. Assuming arguendo that Willis preserved this objection for appellate review, it has no merit. Willis argues that Griffin "spoke with heavy breathing, tears, and sobbing." However, the trial court placed on the record that her testimony "was a reading of her prepared remarks" from which she did not deviate and that she "appeared to focus on the reading until the very end as she was leaving the courtroom." See Jones v. State, 267 Ga. 592, 595 (2) (b) (481 SE2d 821) (1997) (noting the "unusually broad discretion" that this Court has granted the trial court in admitting victim impact evidence, presuming that the trial court will follow the law in not admitting inflammatory or unduly prejudicial evidence). Furthermore, the trial transcript of Griffin's brief testimony does not indicate that she had any difficulty reading her prepared statement, nor does it indicate that she made any emotional displays during her testimony that would unduly prejudice Willis. See Lawler, 276 Ga. at 232 (3) (holding that sobbing or crying during victim impact testimony was not unduly prejudicial); Jones, 267 Ga. at 595 (2) (b) (same). Thus, we conclude that the testimony was not improper.

17. In the sentencing phase, the State presented evidence of Willis's gang membership through two witnesses. Corporal Joseph Wide of the Clarksdale Police Department testified that he had received specialized training in gang identification in which he had been taught how to "recogniz[e] gang signs," including the specific markings or tattoos of the Vice Lords gang, which he described in detail. He explained that, at the time of Willis's arrest in 2004, he had personally observed tattoos on Willis that identified him as a member of the Vice Lords, and he pointed out to the jury three such tattoos on a photograph of Willis. Among other things, he also testified that, as a result of his specialized training and his experience as an officer, he was familiar with the activities and the crimes "that most gang members participate in." Sergeant Tracy Vance of the Coahoma County Sheriff's Department testified that, after Willis's arrest in Tennessee following his escape from the Coahoma County Jail in 2001, he was part of a fugitive squad that brought Willis back to Mississippi and that he then processed Willis back into the county jail. Sergeant Vance testified that it is a regular, customary part of the intake process at the jail to ask incoming inmates "[w]hich gang they [are] involved in or affiliated with," because it is necessary to keep the gang members separated if they are in opposing gangs.

He further testified that when he asked Willis whether he was affiliated with a gang, Willis answered that he was a member of the Vice Lords. Willis alleges three errors related to the admission of the foregoing testimony.

(a) First, Willis contends that, because the State failed to show how the gang evidence was relevant to the issues to be tried, its admission violated his rights under the First and Fourteenth Amendments, citing Dawson v. Delaware, 503 U. S. 159 (112 SCt 1093, 117 LE2d 309) (1992). However, Willis did not object to the State's evidence of his gang affiliation on this basis at trial; thus, the issue is not preserved for ordinary appellate review. See Patterson v. State, 280 Ga. 132, 135 (2) (625 SE2d 395) (2006) (finding a defendant procedurally barred from raising a constitutional claim on appeal, where he did not object on that basis at trial); Tollette, 280 Ga. at 103 (7) (finding a claim that the trial court erred in admitting evidence of the defendant's gang affiliation waived and citing Earnest, 262 Ga. at 495 (1)).

In any event, Willis's contention is without merit. In Dawson, the United States Supreme Court held that the introduction of evidence during a sentencing hearing "prov[ing] nothing more than [a defendant]'s abstract beliefs" can violate the defendant's First Amendment rights when the evidence has no relevance to legitimate issues. Dawson, 503 U. S. at 167.

Willis argues that, as in Dawson, there was no admissible evidence before the jury that made the evidence of his gang affiliation relevant to the issues to be decided at the sentencing phase, improperly resulting in his "guilt by association" with a gang. In support of his contention, Willis correctly points out that the trial court sustained his objection to Corporal Wide's testimony that the Vice Lords gang is "one of the most active[,] popular gangs" for felony activity in Clarksdale and directed the jury to disregard this testimony. However, the jury properly had before it the testimony of Corporal Wide that he had come into contact with members of the Vice Lords gang through his investigations of its members' felony activities and resulting felony arrests and that he personally had made "over 30" arrests of Vice Lords gang members. Evidence that Willis belonged to a gang that had a propensity to engage in felonious criminal activity was relevant to the issue of Willis's character and thus was admissible in the sentencing phase. See, e.g., Braley v. State, 276 Ga. 47, 54 (34) (572 SE2d 583) (2002) ("[R]eliable evidence of bad character . . . is admissible in the sentencing phase of a death penalty trial."); Cook v. State, 270 Ga. 820, 831 (15) (514 SE2d 657) (1999) ("Evidence in aggravation may include reliable information tending to show a defendant's general bad character."). Therefore, there was no error.

(b) Next, Willis contends that the State improperly argued that Willis posed a future danger "simply because he is a member of a gang," citing Henry v. State, 278 Ga. 617, 619-620 (1) (604 SE2d 826) (2004) (holding that it was improper for the State to argue that a defendant would kill in prison and thus pose a future danger, simply because he had killed while free). Because Willis never objected to this argument at trial, the issue is not preserved for ordinary appellate review. See Earnest, 262 Ga. at 495 (1). Furthermore, this contention is meritless. In the portion of the State's argument which Willis now contests, the State argued that, regardless of how Willis came to be a gang member, "the bottom line is he joined a gang and he chose to engage in [criminal] activity," resulting in his arrest and criminal conviction, and that, "even after spending time in jail" and "losing a cousin to gang violence," he still chose to engage in "worse and worse" criminal behavior, as evidenced by his commission of an escape from jail, several intentional parole violations, and, eventually, the crimes before the jury. This argument was not an improper future dangerousness argument; rather, it was based on reasonable inferences from the evidence. See Arrington v. State, 286 Ga. 335, 347 (16) (h) (687 SE2d 438) (2009) (noting the wide latitude that the prosecutor is given to argue inferences from the evidence and not

construing the State's argument based on such inferences as an improper future dangerousness argument). Therefore, there was no error.

(c) Finally, Willis contends that the trial court erred in finding that Sergeant Vance's question to Willis regarding whether he was affiliated with any gang was "a routine booking question" and thus admissible as an exception to Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966). See Pennsylvania v. Muniz, 496 U. S. 582, 601 (III) (C) (110 SCt 2638, 110 LE2d 528) (1990) (plurality opinion); Franks v. State, 268 Ga. 238, 240 (486 SE2d 594) (1997) (applying Muniz). Prior to the sentencing phase, the State sought a ruling from the trial court regarding the admissibility of Sergeant Vance's testimony regarding Willis's statement, and Willis was given an opportunity to object and explicitly declined to do so. Thus, the issue is not preserved for ordinary appellate review. See Earnest, 262 Ga. at 495 (1).

However, under OCGA § 17-10-35 (c) (1), this Court reviews for plain error instances of potential error in the sentencing phase of a trial resulting in the death penalty even when the possible improprieties were not objected to at trial. See Martin, 298 Ga. at 278-279 (6) (d). As Willis declined to contest the voluntariness of his statement to Sergeant Vance at trial, the trial court

did not conduct a hearing pursuant to Jackson v. Denno, 378 U. S. 368, 380 (84 SCt 1774, 12 LE2d 908) (1964). See Brogdon v. State, 255 Ga. 64, 67 (2) (335 SE2d 383) (1985) ("[A]bsent a challenge to the use of a statement in evidence, there is no statutory or constitutional requirement that the trial court hold, sua sponte, a Jackson v. Denno hearing regarding the voluntary nature of the statement."). Thus, notwithstanding Sergeant Vance's limited testimony at trial regarding his question to Willis about any gang affiliation, all of the relevant underlying facts and circumstances surrounding Willis's statement were not before the trial court. See Franks, 268 Ga. at 240 (stating that "[p]olice questioning during booking not requesting basic biographical data . . . must . . . be scrutinized on a case-by-case basis" by reviewing several factors and then determining under a totality of the circumstances whether "interrogation" occurred). Accordingly, as there is no obvious impropriety in the trial court's ruling, this claim affords Willis no basis for relief. See Martin, 298 Ga. at 279 (6) (d) (explaining that, as in other forms of plain error review, one of the requirements for reversal under plain error review pursuant to OCGA § 17-10-35 (c) (1) is that the alleged error be obvious); cf. Mincey v. State, 257 Ga. 500, 506 (10) (360 SE2d 578) (1987) (finding no error in the admission of an officer's testimony that the defendant

had, "during a routine booking procedure on a prior arrest for a different crime, given his street address," where the defendant "thoroughly questioned the witness outside the jury's presence as to all the circumstances surrounding the giving of the statement" and "the trial court properly ruled that this questioning was not reasonably likely to elicit an incriminating response").

## Sentence Review

18. Upon our review of the entire record, we conclude that Willis's death sentences in this case were not imposed under the influence of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1).

19. The jury found beyond a reasonable doubt the following seven statutory aggravating circumstances: the murder of Jerry Williams III was committed during the commission of the murder of Talisa Hankins; the murder of Jerry Williams III was committed during the commission of the murder of Jerry Williams, Jr.; the murder of Jerry Williams III was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind; the murder of Talisa Hankins was committed during the commission of the murder of Jerry Williams, Jr.; the murder of Talisa Hankins was committed during the commission of the murder of Jerry

Williams, III; the murder of Jerry Williams, Jr., was committed during the commission of the murder of Jerry Williams, III; and the murder of Jerry Williams, Jr., was committed during the commission of the murder of Talisa Hankins. See OCGA § 17-10-30 (b) (2), (7).

Upon our review of the record, we conclude that the evidence presented in Willis's trial was sufficient to support the jury's finding beyond a reasonable doubt the existence of each of the statutory aggravating circumstances that it found. See OCGA § 17-10-35 (c) (2) (requiring a review of the statutory aggravating circumstances found by the jury); U.A.P. Rule IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence). See also Ring v. Arizona, 536 U. S. 584, 597-609 (II) (122 SCt 2428, 153 LE2d 556) (2002); Jackson, 443 U. S. at 319 (III) (B).

In examining the statutory aggravating circumstances found by the jury, we note that some of them violate this Court's rule against mutually supporting aggravating circumstances. Although it is not improper to submit to the jury all of the statutory aggravating circumstances supported by the evidence, we have held that the rule against mutually supporting aggravating circumstances is violated where, as with several instances in Willis's case,

one murder is used as a statutory aggravating circumstance of a second murder and then the second murder is used as a statutory aggravating circumstance of the first murder.  See Lance, 275 Ga. at 23 (25).  However, we have also held that it is not improper where there are three murder victims for, as in Willis's case, one murder to serve as a statutory aggravating circumstance of a second murder, the second murder to serve as a statutory aggravating circumstance of a third murder, and then for the third murder to serve as a statutory aggravating circumstance of the first murder.  See Hightower v. State, 259 Ga. 770, 772 (5) (386 SE2d 509) (1989).  And we have further held that it is not improper for, as in Willis's case, one murder to serve as a statutory aggravating circumstance of multiple other murders.  See Heidler v. State, 273 Ga. 54, 65-66 (22) (537 SE2d 44) (2000).  Applying these principles and setting aside the statutory aggravating circumstances that violate them, we nevertheless are not required to set aside any of Willis's three death sentences, because each remains supported by at least one valid statutory aggravating circumstance.  See id. at 66 (22).

20.  Considering the murders for which Willis has been sentenced to death and Willis as a defendant, we conclude that the death sentences imposed in his case are not disproportionate punishment within the meaning

of Georgia law. See OCGA § 17-10-35 (c) (3); Gissendaner v. State, 272 Ga. 704, 716-717 (19) (a) (532 SE2d 677) (2000) (holding that this Court's statutorily mandated proportionality review concerns whether a particular death sentence is excessive per se or is substantially out of line). The cases cited in the Appendix support our conclusion, because each shows a jury's willingness to impose a death sentence for the commission of multiple murders, whether committed in one or more transactions. See OCGA § 17-10-35 (e).

Judgment affirmed in part and vacated in part. All the Justices concur.

APPENDIX.

Martin v. State, 298 Ga. 259 (779 SE2d 342) (2015); Hulett v. State, 296 Ga. 49 (766 SE2d 1) (2014); Rice v. State, 292 Ga. 191 (733 SE2d 755) (2012); Tate v. State, 287 Ga. 364 (695 SE2d 591) (2010); Humphreys v. State, 287 Ga. 63 (694 SE2d 316) (2010); Stinski v. State, 286 Ga. 839 (691 SE2d 854) (2010); O'Kelley v. State, 284 Ga. 758 (670 SE2d 388) (2008); Rivera v. State, 282 Ga. 355 (647 SE2d 70) (2007); Williams v. State, 281 Ga. 87 (635 SE2d 146) (2006); Lewis v. State, 279 Ga. 756 (620 SE2d 778) (2005); Riley v. State, 278 Ga. 677 (604 SE2d 488) (2004); Franks v. State, 278 Ga. 246 (599 SE2d 134) (2004); Sealey v. State, 277 Ga. 617 (593 SE2d 335) (2004); Raheem v. State, 275 Ga. 87 (560 SE2d 680) (2002); Lance v. State, 275 Ga. 11 (560 SE2d 663) (2002); Lucas v. State, 274 Ga. 640 (555 SE2d 440) (2001); Rhode v. State, 274 Ga. 377 (552 SE2d 855) (2001); Colwell v. State, 273 Ga. 634 (544 SE2d 120) (2001); Esposito v. State, 273 Ga. 183 (538 SE2d 55) (2000); Heidler v. State, 273 Ga. 54 (537 SE2d 44) (2000); Morrow v. State, 272 Ga. 691 (532 SE2d 78) (2000); Pace v. State, 271 Ga. 829 (524 SE2d 490) (1999); Cook v. State, 270 Ga. 820 (514 SE2d 657) (1999); DeYoung v. State, 268 Ga. 780 (493 SE2d 157) (1997);

Raulerson v. State, 268 Ga. 623 (491 SE2d 791) (1997); Bishop v. State, 268 Ga. 286 (486 SE2d 887) (1997); McMichen v. State, 265 Ga. 598 (458 SE2d 833) (1995).

Decided October 22, 2018 — Reconsideration denied November 15, 2018.

Murder. Fulton Superior Court. Before Judge Russell.

Charles H. Frier; Akil K. Secret, for appellant.

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Sabrina D. Graham, Channell V. Singh, Assistant Attorneys General, for appellee.